LATHROP, Appellant, v. DONOHUE, Respondent.

*March 11—April 5, 1960.*

232

For the appellant there were briefs and oral argument by *Trayton L. Lathrop*, attorney, and *Leon E. Isaksen* of counsel, both of Madison.

For the respondent there was a brief by *Joseph D. Donohue* of Fond du Lac, attorney, and *Gordon Sinykin* of Madison of counsel, and oral argument by *Mr. Sinykin*.

CURRIE, J. This court has determined to consider the constitutional issue raised on its merits and not to dispose of the appeal upon procedural grounds.

While we are of the opinion that the learned trial court properly determined that the circuit court was without jurisdiction to pass upon the validity of an order of this court which regulates the practice of law, we will treat the action as though it had been originally and properly brought in this court. The reason for so doing is that this action is one *publici juris* in which we have had the benefit of most-thorough and adequate briefs and oral argument upon the constitutional issue presented. Under such circumstances we deem it would work an injustice to dismiss the action and compel the plaintiff to commence a new proceeding in this court to relitigate the same issue.

The other procedural ground upon which the trial court sustained the demurrer to the complaint was that there was a defect of parties defendant. In so holding, the trial court determined that the State Bar is an indispensable party to this litigation under sec. 260.19 (1), Stats. However, we deem that there may be some merit to the plaintiff's contention that in order to rule that there is a defect in parties

defendant it is necessary to decide the constitutional issue. This is because, if the orders of this court creating the State Bar an entity are void, then it has no standing which would require it to be made a party. We are satisfied that counsel for the defendant Donohue has so competently marshaled the facts and the law in support of the constitutionality of the orders creating the State Bar that its interests do not require that it be made a party. Both the trial court and this court possess the power to have compelled, on the court's own motion, the impleading of it as a party defendant, if its interests were deemed to require that this be done, as an alternative to dismissal of the action because of failure of the plaintiff to have joined it as a party.

The plaintiff bottoms his contention, that the integration of the bar is unconstitutional, upon the thesis that such integration violates the First-amendment freedoms of free speech, press, assembly, and petition which are inherent in the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment. He also claims that there is a violation of these same freedoms as stated in various sections of art. I of the Wisconsin constitution. However, such provisions of the Wisconsin constitution are substantially the equivalent of the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment. *Boden v. Milwaukee* (1959), 8 Wis. (2d) 318, 324, 99 N. W. (2d) 156, and *Pauly v. Keebler* (1921), 175 Wis. 428, 185 N. W. 554. We are satisfied that if the orders creating and continuing the State Bar violate the provisions of art. I of the state constitution they also violate the Fourteenth amendment. We will, therefore, confine our consideration of the constitutional issue to whether there exists a violation of the Fourteenth amendment.

In *Integration of Bar Case* (1943), 244 Wis. 8, 11 N. W. (2d) 604, the argument was advanced that the statute

enacted by the legislature (ch. 315, Laws of 1943), which provided for this court's integrating the bar, violated the Fourteenth amendment. Mr. Chief Justice ROSENBERRY in his opinion for the court dealt with such argument at pages 41 to 44 thereof. It was there determined that an integration of the bar would not violate the Fourteenth amendment.

While we might ground our decision of the instant case on this sound precedent authored by one of the great chief justices of this court, we choose not to do so. This is because the plaintiff has advanced some arguments that were not presented to the court when it previously considered the constitutional issue in 1943.

The plaintiff commences his argument with the sound premise that the right of any person to belong to an association embodies certain First-amendment freedoms protected by the Fourteenth amendment. As the United States supreme court recently declared in *Bates v. Little Rock* (1960), 361 U. S. 516, 523, 80 Sup. Ct. 412, 416, 4 L. Ed. (2d) 480, 485:

"And it is now beyond dispute that freedom of association for the purpose of advancing ideas and airing grievances is protected by the due-process clause of the Fourteenth amendment from invasion of the states. *De Jonge v. Oregon,* 299 U. S. 353, 364, 57 Sup. Ct. 255, 259, 81 L. Ed. 278; *National A. A. C. P. v. Alabama,* 357 U. S. 449, 460, 78 Sup. Ct. 1163, 1170, 2 L. Ed. (2d) 1488."

This court held to the same effect in *Lawson v. Housing Authority* (1955), 270 Wis. 269, 274, 70 N. W. (2d) 605.

From this premise the plaintiff argues that the converse is also true, *i.e.,* the right not to belong to an association is also a freedom protected by the Fourteenth amendment. In support thereof he cites the following statement from the opinion of the Maine court in *Pappas v. Stacey* (1955), 151

Me. 36, 42, 116 Atl. (2d) 497, 500: "Freedom to associate of necessity means as well freedom not to associate." [1]

However, decisions of serious questions of constitutional law ought not to be grounded upon cliché.

The rules and by-laws of the State Bar, as approved by this court, do not compel the plaintiff to associate with anyone. He is free to attend or not attend its meetings or vote in its elections as he chooses. The only compulsion to which he has been subjected by the integration of the bar is the payment of the annual dues of $15 per year. He is as free as he was before to voice his views on any subject in any manner he wishes, even though such views be diametrically opposed to a position taken by the State Bar.

The right to practice law is not a right but is a privilege subject to regulation. *Petition for Integration of Bar of Minnesota* (1943), 216 Minn. 195, 12 N. W. (2d) 515, 518. As the Arizona court well stated in *In re Greer* (1938), 52 Ariz. 385, 389, 81 Pac. (2d) 96, 98:

"The right to practice law is not a natural nor constitutional one, in the sense that the right to engage in the ordinary avocations of life, such as farming, the industrial trades, and the mercantile business is. It has always been considered as a privilege only, bestowed upon certain persons primarily for the benefit of society, and upon such terms and conditions as the state may fix. The final determination as to what these conditions are, and who has satisfactorily complied therewith, is, and always has been, in the courts before which the individual practices his profession, and from time immemorial such individuals have been considered essentially and primarily as officers of the court admitting them."

[1] In making such statement the Maine court was not referring to rights protected by the Fourteenth amendment, but was interpreting a state statute which provided, "Workers shall have full freedom of association, . . ."

The only limitation upon the state's power to regulate the privilege of the practice of law is that the regulations adopted do not impose an unconstitutional burden or deny due process. *Schware v. Board of Bar Examiners* (1957), 353 U. S. 232, 77 Sup. Ct. 752, 1 L. Ed. (2d) 796.

Mr. Chief Justice ROSENBERRY declared in the *Integration of Bar Case* (1943), *supra,* that the dues payable by a lawyer to an integrated bar imposed by state action are in the same category as an annual license fee imposed upon any occupation or profession which is subject to state regulation. This is also the holding of the Florida and Louisiana courts in *Petition of Florida State Bar Asso.* (Fla. 1949), 40 So. (2d) 902, and *In re Mundy* (1942), 202 La. 41, 11 So. (2d) 398. The fact that a license fee exacted by the courts is not deposited in the public treasury but is disbursed by the court-created agency to which paid, does not militate against the validity of such license fee. *Laughlin v. Clephane* (Dist. Columbia, 1947), 77 Fed. Supp. 103.

The plaintiff grounds his argument, that the compulsory dues of the State Bar do impinge upon First-amendment freedoms, on the fact that the State Bar does take a stand on legislation pending before the legislature. He points out that he personally is opposed to some of the legislation supported by it. Because of this, he contends his rights guaranteed by the First amendment are violated because part of his dues money is used to support causes to which he is opposed.

Whatever activity in the legislative field in which the State Bar does engage is limited by its rules and by-laws promulgated by this court. Two of the standing committees which the board of governors is directed to establish by Rule 4 are the committee on administration of justice and the committee on legislation. Secs. 4 and 9 respectively of the by-laws define the duties of these two committees and read as follows:

"*Section 4. Committee on administration of justice.* This committee shall study the organization and operation

of the Wisconsin judicial system and shall recommend from time to time appropriate changes in practice and procedure for improving the efficiency thereof; and in that connection shall examine all legislative proposals for changes in the judicial system.

"*Section 9. Committee on legislation.* This committee shall study all proposals submitted to the Wisconsin legislature or the congress of the United States for changes in the statutes relating to the courts or the practice of law, and shall report thereon to the board of governors; and with the approval of the board of governors may represent the State Bar in supporting or opposing any such proposals."

This court takes judicial notice of the activities of the State Bar in the legislative field since its creation by this court in 1956. In every instance the legislative measures advocated or opposed have dealt with the administration of justice, court reform, and legal practice. Neither the above-quoted by-laws nor the stated purposes set forth in section 2 of Rule 1 for which the bar was integrated would permit the State Bar to be engaged in legislative activities unrelated to these three subjects. The plaintiff complains that certain proposed legislation, upon which the State Bar has taken a stand, embodies changes in substantive law, and points to the recently enacted Family Code. Among other things, such measure made many changes in divorce procedure, and, therefore, legal practice. We do not deem that the State Bar should be compelled to refrain from taking a stand on a measure which does substantially deal with legal practice and the administration of justice merely because it also makes some changes in substantive law.

We are of the opinion that the public welfare will be promoted by securing and publicizing the composite judgment of the members of the bar of the state on measures directly affecting the administration of justice and the practice of law. The general public and the legislature are entitled to know how the profession as a whole stands on such type of proposed legislation. This is a function an inte-

grated bar, which is as democratically governed and adminis-
tered as the State Bar, can perform much more effectively
than can a voluntary bar association. Cf. *Petition of Florida
State Bar Asso., supra.*

The plaintiff contends that the State Bar's legislative
activities are the same as those of such voluntary bar associa-
tions as the former Wisconsin Bar Association and the
American Bar Association. Such argument ignores the
obvious and very material distinction that exists between
the legislative activities of the State Bar and those of a
voluntary association. A voluntary association is free to
take a stand on any proposed legislation in any field it
deems desirable. This is not true of the State Bar which
must confine its activities in legislative matters to those
authorized by the rules and by-laws promulgated by this
court. In so far as it confines such activities to those au-
thorized by the rules and by-laws, this court will not inter-
fere or in any manner seek to control or censor the action
taken, or to substitute its judgment for that of the member-
ship of the State Bar. This was made crystal-clear in our
opinion in *In re Integration of Bar* (1958), 5 Wis. (2d)
618, 625–627, 93 N. W. (2d) 601. Any other course
would be abhorrent to our sense of devotion to the ideal
of a free and independent bar. However, as we pointed out
in our opinion in the 1958 *In re Integration of Bar Case,*
this court will exercise its inherent power to take remedial
action should the State Bar engage in an activity not author-
ized by the rules and by-laws and not in keeping with the
stated objectives for which it was created. If the lawyers of
the state wish by group action to engage in legislative activi-
ties not so authorized they will have to do so within the
framework of some voluntary association, and not the State
Bar.

In the recent case of *Dulles v. Johnson* (2d Cir. 1959),
273 Fed. (2d) 362, the court had before it the question of

whether bequests to certain New York bar associations were exempt from federal estate tax. While such associations were voluntary in character, their activities in legislative matters seem to have been similar in scope to those of the State Bar of Wisconsin. The commissioner of internal revenue contended that the bequests were subject to tax because the associations were attempting to influence legislation and to carry on propaganda. However, the court ruled that the bequests were exempt and stated (p. 367):

"Moreover, the legislative recommendations of the associations, in so far as these recommendations do not involve matters the responsibility for which has been intrusted to the associations by the legislature, are designed to improve court procedure or to clarify some technical matter of substantive law. They are not intended for the economic aggrandizement of a particular group or to promote some larger principle of governmental policy. These two factors lead us to the conclusion that the recommendations of the associations concerning impending legislation are not such as to cause the forfeiture of charitable status under section 812 (d)."

In other words, the court of appeals for the second circuit determined that these restricted legislative activities were in the public interest and did not destroy the exemption.

While the police power is generally considered an exclusive power of the legislature, it may be exercised by courts. *Petition of Florida State Bar Asso., supra.* In such cited case the court held that its exercise of inherent power to integrate the Florida bar constituted an exercise of the police power. We deem that the same is true of the 1956 and 1958 orders of this court integrating the bar of this state, and continuing the same, in order to improve the administration of justice. In situations where regulatory measures adopted by the states, or agencies thereof, pursuant to the police power, are attacked as infringing First-amendment freedoms, the courts are required to balance the competing public and private interests at stake. *Barenblatt v.*

*United States* (1959), 360 U. S. 109, 126, 79 Sup. Ct. 1081, 3 L. Ed. (2d) 1115; *National Asso. for Advancement of Colored People v. Alabama* (1958), 357 U. S. 449, 463, 466, 78 Sup. Ct. 1163, 2 L. Ed. (2d) 1488; and *Schneider v. State* (1939), 308 U. S. 147, 161, 60 Sup. Ct. 146, 84 L. Ed. 155.

When we attempt to balance the competing interests at stake in this action we find no regulation of, or interference with, any of the plaintiff's rights of free speech, assembly, or petition. The only challenged interference with his liberty is the exaction of annual dues to the State Bar, in the nature of the imposition of an annual license fee, not unreasonable or unduly burdensome in amount, part of which is used to advocate causes to which he is opposed. However, this court, in which is vested the power of the state to regulate the practice of law, has determined that it promotes the public interest to have public expression of the views of a majority of the lawyers of the state, with respect to legislation affecting the administration of justice and the practice of law, the same to be voiced through their own democratically chosen representatives comprising the board of governors of the State Bar. The public interest so promoted far outweighs the slight inconvenience to the plaintiff resulting from his required payment of the annual dues.

Furthermore, the State Bar is a public and not a private agency. In the annotation entitled, "State bar created by act of legislature or rules of court; integrated bar," 114 A. L. R. 161, the author states:

"While the statutes or court rules under which they have been organized differ to some extent, integrated bars have the common characteristics of being organized by the state or under the direction of the state, and of being under its direct control, and in effect they are governmental bodies."

*State Bar of California v. Superior Court* (1929), 207 Cal. 323, 278 Pac. 432, 434, and *In re Gibson* (1931), 35 N. M. 550, 4 Pac. (2d) 643, 653, support the above-quoted statement.

In 1951 the Wisconsin legislature created the judicial council. Of the present sixteen members thereof, four are chosen by the State Bar as a result of a secret ballot of its active members, three directly for such position, and the fourth *ex officio* because of having been elected president-elect of the organization. Such judicial council has been expressly authorized by the legislature to recommend to it "changes in the organization, jurisdiction, operation, and methods of conducting the business of the courts." Sec. 251.181 (2) (f), Stats. Thus it advocates adoption of legislation of the same category on which the State Bar voices a position. The council's activities are financed by an appropriation of the legislature and thus are supported out of the state's tax revenues. We are satisfied that the plaintiff as a taxpayer could not successfully challenge the constitutionality of the disbursement of public funds derived from taxes to support the activities of the judicial council merely because he was opposed to certain proposed legislation which it recommended be passed by the legislature. We can perceive no valid basis for distinguishing that situation from the one'here confronting us in so far as constitutionality is concerned. The State Bar is a public agency the same as the judicial council. One has been created by the court and the other by the legislature but each was created by state action as a state agency to serve a public purpose.

While the plaintiff does not challenge the constitutionality of the purposes, other than legislative, for which the State Bar expends the annual dues collected from its members, we deem it advisable to set forth in an appendix to this opinion

an analysis of such activities and the public purpose served thereby. Such analysis is not based upon the allegations of the complaint but upon facts of which this court takes judicial notice.

A considerable portion of plaintiff's brief is devoted to an impassioned argument that the integration of the bar is but the initial step which will lead to fascist syndicalism of the type rampant in Italy during Mussolini's years of power. As plaintiff points out, the chief evil of such a system was that the syndicates usurped and exercised the powers which in a democracy would be exercised by parliament and the courts, with resulting curtailment of the liberties of the people. That integration will lead to fascist syndicalism is an argument addressed to the policy-making functions of the court, which would be material on the issue of whether or not to direct that the bar be integrated, but is hardly pertinent with respect to the issue of constitutionality. It is the constitutional issue alone with which we are here concerned.

Some of the states which have had long years of experience with an integrated bar, and the years in which such integration was accomplished are:

| | |
|---|---|
| North Dakota | 1921 |
| California | 1927 |
| South Dakota | 1931 |
| Washington | 1933 |
| Missouri | 1934 |

If bar integration were to lead to syndicalism, one would think that some start in this direction at least would be discernible by now after the lapse of a period in excess of twenty-five years that these five states have had integrated bars. The fact that no such trend has occurred after such

long experience with an integrated bar is to us convincing proof of the groundless nature of plaintiff's fears.

Mr. Justice HOLMES, in his famous dissent in *Panhandle Oil Co. v. Knox* (1928), 277 U. S. 218, 223, 48 Sup. Ct. 451, 72 L. Ed. 857, after referring to Chief Justice MARSHALL's often-quoted dictum that the power to tax is the power to destroy, declared, "The power to tax is not the power to destroy while this court sits." This prompts us to observe that any usurpation on the part of the State Bar of the powers of either the legislature or the courts will not occur so long as this court sits. Without such usurpation of legislative or judicial power there can be no fascist syndicalism.

It is our considered judgment that the orders of this court integrating the bar, and continuing such integration, violate none of the First-amendment freedoms of the plaintiff as embodied in the due-process and equal-protection-of-the-laws clauses of the Fourteenth amendment.

While we have considered and resolved the constitutional issue as if this were a proceeding originally brought in this court, our mandate also will affirm the judgment below.

*By the Court.*—The order of this court of December 7, 1956, which promulgated the rules and by-laws of the State Bar of Wisconsin effective for a two-year period, and the further order of this court of December 22, 1958, which continued the State Bar of Wisconsin on a permanent basis, do not violate the Fourteenth amendment to the United States constitution and are constitutional. The judgment appealed from is affirmed.

HALLOWS, J., took no part.

## APPENDIX.

*Major Activities of State Bar of Wisconsin.*

### Postgraduate Education of Lawyers.

The most-extensive activities of the State Bar are those directed toward postgraduate education of lawyers. There is a great need for this because of the rapid changes and new developments that have occurred in the field of law subsequent to the admission to practice of a large percentage of the lawyers of the state. This trend shows no signs of abating. In order that lawyers be qualified to properly represent clients such postgraduate education is essential.

The State Bar provides such postgraduate education through its annual and separate midwinter meetings, its regional meetings, its annual tax school, and its publication of the Wisconsin Bar Bulletin. The annual and the midwinter meetings of the State Bar are each of at least two days' duration and are largely devoted to the delivery of papers on technical legal subjects of an instructive nature. The same is true of the one-day regional meetings annually held throughout the state. At the annual two-day tax school the papers delivered are confined to the fields of taxation. Many of these papers delivered at these various meetings are later published in the Wisconsin Bar Bulletin so that they will be available for instant reference by all members of the bar of the state. Each member of the State Bar receives a copy of the Wisconsin Bar Bulletin by mail as issued, it being published bimonthly.

Postgraduate education of lawyers is in the public interest because it promotes the competency of lawyers to handle the legal matters intrusted to them by those of the general public who employ them.

## Public Relations.

The field of endeavor carried on under the name of "public relations" would better be termed "public service." The chief activity carried on in this field by the State Bar is the preparation, publication, and distribution to the general public of pamphlets dealing with various transactions and happenings with which laymen are frequently confronted, which embody legal problems. Alternative courses of action are sometimes set forth and the advantages and disadvantages of each explained. Where there is danger that a layman might be likely to overlook some positive requirement of the law, such requirements are pointed out. Among the titles of such pamphlets are: "It May be Your Turn Next—What to do in Case of an Auto Accident;" "Have You Made a Will;" "Sound Steps in Purchasing a Home;" and "Joint Tenancy—Boon or Boomerang." Banks and trust companies, local bar associations, and others purchase these pamphlets from the State Bar at slight advance above the cost of publication in order to cover boxing and mailing expense. The statement of receipts and disbursements of the State Bar for the calendar year of 1959 shows receipts of $2,748.27 from the sale of pamphlets which receipts should be credited against a total expenditure for "Public Relations" of $2,743.55.

Another activity of the State Bar in this field consists of preparation of informative articles on legal subjects which are offered for publication to the newspapers throughout the state, and are published under the heading of "The Law and You."

A further public relations activity is the preparation and distribution of news releases covering the activities of the State Bar, such, for example, as the observance throughout the state of "Law Day, U.S.A."

### Discouraging Unauthorized Practice of the Law.

One of the standing committees of the State Bar is that of unauthorized practice of law. The primary purpose of such committee is to protect the public from incompetent laymen attempting to offer or perform legal services which they are not competent to render. This is a constant program since numerous trades and occupations keep expanding their services and frequently start offering services which constitute the practice of the law. As a result of integration the income from dues has enabled the State Bar to employ an additional lawyer on its staff whose major assignment is to investigate complaints made with respect to instances of unauthorized practice of the law, and to cause any unauthorized practices so discovered to be discontinued through persuasion or legal action.

### Establishment of a Minimum-Fee Schedule.

The State Bar recently adopted a recommended minimum-fee schedule covering legal services. The present economic plight of the lawyers in this country is one which has disturbed the bench and the bar. Able young men who otherwise might be attracted to entering the legal profession are being discouraged not to because of this. Lawyers already in the profession because of insufficient incomes are caused to forsake the practice of law for more financially attractive fields of endeavor. According to statistics gathered by the economics of law practice committee of the American Bar Association during the period of 1929 to 1951, the net income of lawyers increased but 58 per cent, while for the same period that of dentists rose 83 per cent and that of physicians 157 per cent. During the same period the net income of employees of all industry increased 131 per cent.

During 1954 the net income before taxes of one third of all practicing lawyers of the nation was less than $5,485.

The quality of legal service which will be rendered to the public is likely to suffer if young men of ability are dissuaded from entering the profession because of the difficulty of securing an adequate financial reward to enable them to properly support themselves and their families. A minimum-fee schedule which realistically recommends charges for legal services that are in keeping with the increased cost of living that has taken place since World War II, should have a tendency toward remedying this condition. Such a schedule also serves a further public purpose because it provides a guide for the basing of legal charges that tends to prevent overcharges as well as undercharges. Lawyers, who are true to their oath of admission, recognize that adoption of a recommended minimum-fee schedule does not relieve them from the duty of serving the poor without compensation, or of reducing the charge if the normal charge would be unduly burdensome to a client of limited means. Furthermore, a lawyer's charge for services, even when based upon the recommended schedule, is always subject to the courts' determination of reasonableness.

## Legal Aid.

Another of the standing committees of the State Bar is the legal-aid committee. This committee has done effective and noteworthy work to encourage the local bar associations of the state to set up legal-aid systems in their local communities under which legal services are rendered without charge to the indigent in the need of the same. Such committee has also outlined recommended procedures for establishing and carrying through such systems of providing legal aid.

### Investigation and Adjustment of Grievances.

The State Bar has created grievance committees for each of the nine districts into which the state has been divided for election purposes. These districts coincide with the congressional districts of the state except for combining the two congressional districts of Milwaukee county into one district. While the supreme court has delegated none of its power to punish disciplinary infractions, these State Bar grievance committees perform a valuable function in investigating and adjusting grievances filed against lawyers of the district in which the particular grievance committee functions. Prior to integration of the bar most of such grievances were investigated by the paid counsel of the Board of State Bar Commissioners, and the cost thereof was defrayed from the general tax revenues of the state. Since integration most of such work of investigation of grievances has been done by the grievance committees of the State Bar. As a result there has been a saving to the general taxpayers of the state. One evidence of this is that the Board of State Bar Commissioners is requesting a decrease in its appropriation from the state of $800 less for the coming biennium than was appropriated in the present biennium.

### Legislative Activities.

In addition to the legislative activities of the State Bar to which the plaintiff objected, and which are discussed in the opinion, the State Bar performs the further function of promptly publicizing to the lawyers of the state pending and adopted legislation affecting legal practice. Acts lengthy in scope, such as the Family Code and the act extending the jurisdiction of the courts over nonresident persons and corporations, are analyzed and explained by articles published in the Wisconsin Bar Bulletin. Such activities enable the lawyers to better serve their clients.