AxEL, Plaintiff, v. STATE BAR OF WISCONSIN, Defendant.

*November 7—November 27, 1963.*

For the plaintiff there was a brief and oral argument by *Gordon K. Aaron* of Milwaukee.

For the defendant there was a brief and oral argument by *W. Wade Boardman* of Madison.

PER CURIAM. The jurisdiction of this court under its general supervisory powers over the integrated State Bar of Wisconsin to grant leave to commence the original action is not questioned. That question was settled in *In re Integration of the Bar* (1958), 5 Wis. (2d) 618, 93 N. W. (2d) 601, and the principle applied in *Lathrop v. Donohue* (1960), 10 Wis. (2d) 230, 102 N. W. (2d) 404. The issue is whether sufficient justification is shown for this court to assume jurisdiction of such an action and to grant a preliminary injunction pending the hearing and determina-

tion of the cause. Not at all peculiar in this type of case, the issuance of a preliminary injunction would have the effect of granting all the relief which could be obtained by a final decree. Because time was of the essence our ruling was made prior to the writing of this opinion.

The facts, which are not in dispute, are set forth in the affidavits. David Rabinovitz, a member of the State Bar of Wisconsin and a resident of the Eastern district of Wisconsin was nominated for appointment as judge of the federal district court for the Western district of Wisconsin by the President of the United States to fill a vacancy in that office.[1] The consideration of the nomination is pending before the United States Senate for its "advice and consent" and particularly before the Senate judiciary committee. It is common knowledge the continued existence of the vacancy and the nomination was a matter of more than average public concern. In response to a notice from the chairman of that committee of a public hearing to consider the nomination, the State Bar through its president, Francis J. Wilcox, informed the committee the State Bar by its executive committee had determined not to appear and not to submit any opinion or recommendation. Upon the urging of numerous members that the State Bar should take a stand on the nomination, the executive committee reconsidered the matter and determined not to alter the announced position of the State Bar of Wisconsin. The public hearing was held on October 9th and adjourned upon the announcement another hearing would be scheduled later this year. After the hearing, numerous members of the State Bar requested its president in effect that if the State Bar was not taking a position

[1] United States constitution, sec. 2, art. II: "The president . . . ; and he shall nominate, and by and with the advice and consent of the senate, shall appoint . . . judges of the supreme court, and all other officers of the United States, . . . ."

then its members should be polled and the results made known to aid the Senate judiciary committee in its determination.

The executive committee on October 21st by a two-third vote decided to submit to the active members of the State Bar the following questions in ballot form:

"1. Do you favor a Bar Referendum on the    YES ———
qualifications of DAVID RABINO-
VITZ for appointment to the Federal    NO ———
Court of the Western District of Wis-
consin?

NO OPINION    ———

"2. In my opinion DAVID RABINOVITZ
is not qualified for appointment to the
Federal Court of the Western District
of Wisconsin.......................    ———

"In my opinion DAVID RABINOVITZ
is qualified for appointment to the Fed-
eral Court of the Western District of
Wisconsin .......................    ———

NO OPINION    ———

"The results of the ballots will not be released
or made public unless a majority of the ballots cast answer Question 1 in the affirmative, in which case the tabulation of the answers to Question 2 will be released."

While these ballots were in the hands of the members of the bar a special meeting of the board of governors was called upon request of four members of the board and on November 2, 1963, after a motion to abandon the referendum was tabled, the board of governors by a vote of 17 to 12 ratified the action of the executive committee and directed the referendum to be completed and made public on November 4th.

On November 4th this petition was filed which included a request for an order temporarily restraining the publication of the result of the referendum. However, the restraining order expressly did not restrain the tabulation and publication of the result of the "referendum" on Question 1. Shortly thereafter a tabulation of the answers to Question 1 was made public. Of the 5,055 ballots sent, 3,536 were returned. The tabulation indicated 2,239 members approved the poll on the expression of opinion contained in the second question; that 1,043 opposed the poll; and 125 had no opinion. There were 124 blank ballots returned and five ballots were disqualified by the independent auditors.

The petitioner contends the action of the State Bar was illegal, beyond its objectives and the scope of its powers, and irreparable harm will result if the result of the second question is made public. The State Bar argues the taking of the poll of the opinions of its members on the qualifications of an appointee to the United States district court for the Western district of Wisconsin is not beyond the authorized scope of its activities, and the poll was properly authorized and is not contrary to the public interest.

At the time of the integration of the bar we stated [2] the Integrated Bar of Wisconsin was independent and free to conduct its activities within the framework of its rules and bylaws. Within the confines of the rules and bylaws, this court expected the bar to act freely and independently on all matters which promote the purposes for which the bar was integrated, subject to the general supervisory powers of this court. We observed the rules and bylaws constitute a democratic process by which the members of the bar could govern themselves and can act in unison and by which the minority of the members is protected. Procedures were established

---

[2] *In re Integration of the Bar* (1958), 5 Wis. (2d) 618, 93 N. W. (2d) 601.

whereby a minority could have questions of association policy submitted for determination by a referendum to the active members of the Integrated Bar.

Some confusion exists in this case in the use of the words "referendum" and "poll." The petitioner considers the activities to be a referendum; the State Bar treats them as conducting a poll and at the most the first question as a referendum which is moot and not an issue in the case. A referendum is ordinarily a practice or method of submitting to popular vote a measure based upon or proposed by a legislative body or a governing body to determine the action that that body should take. A poll, however, is essentially the casting or recording of votes of a body of persons to obtain information or opinions on a certain subject matter but the results thereof do not determine any official action upon the organization conducting the poll. The rules and bylaws of the State Bar are silent on polls, but Rule 7 provides a method by which a referendum on a question of association policy may be initiated either by the members themselves or by the board of governors. Rule 5, sec. 3, provides the executive committee has all the powers of the board of governors between its quarterly meetings. On the petitioner's theory a referendum was conducted; we find it was authorized by the executive committee and later approved by the board of governors in accordance with the rules. However, we do not hold that canvassing the opinions of the members of the bar of the qualifications of a judicial appointee is a question of association policy. The policy of the State Bar as an association was not to express an opinion upon the nomination.

The so-called referendum does not deal with the position of the State Bar but calls for an expression of opinion for informational purposes of the individual members of the association to be released and made public only if the majority

so vote. As a precaution the polling of the individual members for an expression of their opinion might be considered a policy question, the procedure for a referendum of that question was followed. It is perhaps misleading that Question 1 referred to a bar "Referendum" on the qualifications and Question 2 called for a direct expression of an opinion of the voter and not for an opinion on the position of the State Bar, which would be determined by the majority of the votes cast. It should be apparent that no member of the bar was misled in believing that he was voting on a question of association policy rather than participating in a poll which result would reflect the conflicting opinions of the individual members of the bar.

The petitioner argues the action of the State Bar, whether a poll or referendum, impinges on an area of legislation not open to State Bar activity. The advice and consent, sometimes referred to as a confirmation, by the United States Senate of a nomination to judicial office made by the President is not a matter of legislation, at least within the meaning of the bylaws and rules of the State Bar of Wisconsin.

The question remains whether the polling of its members to determine whether the majority of them approve of a polling of opinions on the qualification of the nominee and the disclosure of the results is a forbidden activity of the State Bar. Polls conducted of its members by bar associations on the qualifications of judicial candidates for election are quite common. They are looked upon as being a great public service and as a means of informing the electors of the qualifications of the candidates by a class of citizens who normally would be better informed of the candidates' qualifications than the general public. It has been generally considered to be proper and the duty of the bar to "protest earnestly and actively against the appointment or election of those who are unsuitable for the Bench." Canon 2 of the

Canons of Professional Ethics, American Bar Association. The converse is likewise true and there exists a like duty of the bar to earnestly and actively advocate the appointment or election of those who are suitable for the bench. Polling the members of the bar is only one means of fulfilling these duties. By integrating the bar we did not contemplate the influence of the organized bar would be rendered sterile and impotent but rather it would be made more effective.

The appointment or selection of well-qualified men for judicial office is but a part of the larger area commonly referred to as the administration of justice. Effective justice is only attained when fairly administered without delay by competent judges operating in a modern court system under simple and efficient rules of procedure. A Second Annual Report of Activities of The Joint Committee for the Effective Administration of Justice, Journal of the American Judicature Society (October, 1963), Vol. 47, No. 5, page 93. Activity of the State Bar in all four fields to improve the administration of justice is within the purposes and objectives of the State Bar. Public interest will be promoted by securing and publicizing the opinions of the members of the bar on matters affecting the administration of justice. Executives who appoint, legislative bodies which confirm, and the public who elects are entitled to know how the members of the legal profession or how the State Bar stands on the qualifications of various candidates for judicial office.

The absence of any bylaws or rules of the State Bar does not imply a prohibition against taking a poll of the members of the bar on subjects within the legitimate concern of the association. Whether it is advisable to take a poll on a subject within the objectives and purposes of the bar is a matter for the bar to determine. Recognizing the independence of the bar within its legitimate area of activity, we are not inclined to review its discretionary action. Such review on our part would destroy the independence of the bar.

The arguments of the petitioner relating to procedural problems within the bar, his injury by the disclosure of the results of the poll, and the uselessness of such a poll, have little or no merit. The qualifications of the nominee are not before this court nor are personalities. The sole question is whether a proper case is presented for this court to interfere with the alleged activities of the State Bar under its supervisory powers. We hold no such case is presented.

It is ordered and adjudged, that the petition be and hereby is denied, and the temporary restraining order is dissolved.

GORDON, J. (*dissenting*). I must respectfully dissent.

As one who favored the launching of the Integrated Bar, I regret to see it founder on the very shoals which its antagonists predicted.

In *Lathrop v. Donohue* (1960), 10 Wis. (2d) 230, 102 N. W. (2d) 404, the supreme court of Wisconsin scrutinized the proper sphere of action on the part of the Integrated Bar. The matter of the selection of judges was not discussed. However, the court noted the major activities of the bar under the following headings (Appendix, p. 246 *et seq.*): Postgraduate Education of Lawyers; Public Relations; Discouraging Unauthorized Practice of the Law; Establishment of a Minimum-Fee Schedule; Legal Aid; Investigation and Adjustment of Grievances; and Legislative Activities.

When the *Lathrop Case* reached the United States supreme court (1961), 367 U. S. 820, 81 Sup. Ct. 1826, 6 L. Ed. (2d) 1191, there was a plurality opinion written by Mr. Justice BRENNAN, who observed, at page 829, that there is a "judicial selection" committee of the State Bar. However, the court quoted the specific functions of that committee, and it is of interest to note therefrom that the "judicial selection" committee is clearly not designed to play any role whatsoever in the political processes by which judges are chosen:

"This committee shall study and collect information pertaining to judicial selection, tenure, and compensation, including retirement pensions, and shall report from time to time to the association with respect thereto."

In a concurring opinion by Mr. Justice HARLAN, in which Mr. Justice FRANKFURTER joined, there appears the following, at page 853:

"In establishing the Integrated Bar Wisconsin has, I assume all would agree, shown no interest at all in favoring particular candidates for judicial or legal office or particular types of legislation. Even if Wisconsin had such an interest, the Integrated Bar does not provide a fixed, predictable conduit for governmental encouragement of particular views, for the Bar makes its own decisions on legislative recommendations *and appears to take no action at all with regard to candidates.* By the same token the weight lent to one side of a controversial issue by the prestige of government is wholly lacking here." (My emphasis.)

It is my conclusion that it was not contemplated by either the Wisconsin supreme court or the United States supreme court that an integrated bar would utilize its structure for participation in activities designed to influence the success of a specific nominee or candidate. That would be a proper activity of a voluntary bar but not of one which is compulsory.

The court's opinion stresses that the poll is an expression of the opinions of the individual members and not "a position of the State Bar." In my view, this is completely unrealistic; perhaps the best proof of this is the vast number of headlines, news stories, and even cartoons which almost invariably reported the result as the "State Bar's rejection" of the nominee.

It is not enough to say (as does the instant *per curiam* decision) that the selection of judges is "a part of the larger area commonly referred to as the administration of justice." Lawyers are intimately involved in almost all significant

events relating to the flow of human affairs. In the *Lathrop Case,* the Wisconsin supreme court observed, at page 238, that the State Bar has a committee on administration of justice, but a reading of the duties of that committee suggests that the qualifications of a particular judicial appointee are not a part of its proper activities:

" 'Section 4. *Committee on administration of justice.* This committee shall study the organization and operation of the Wisconsin judicial system and shall recommend from time to time appropriate changes in practice and procedure for improving the efficiency thereof; and in that connection shall examine all legislative proposals for changes in the judicial system.' "

Of course, the selection of a federal judge is of major importance to the bar and to the community. So too each of the following matters is now or formerly was of great importance:

(1) Whether the United States constitution is to be amended to provide for a so-called "court of the union," a supercourt of the chief justices of the several states. (Jt. Res. 9A and 11S.)

(2) Whether the United States constitution is to be amended to preclude federal courts from entertaining suits regarding the apportionment of state legislatures. (Jt. Res. 11A and 12S.)

(3) Whether the United States constitution is to be amended to permit future amendments of such constitution to be initiated by the legislatures of two-thirds of the states. (Jt. Res. 10A and 13S.)

(4) Whether the scope of the treaty-making power contained in the United States constitution shall be narrowed. (Bricker Amendment.)

(5) Whether the acceptance by the United States of the jurisdiction of the World Court should have re-

served the right to decide if the matter was within the jurisdiction of the World Court. (Connally Amendment.)

(6) Whether the United Nations should seek the release of Cuban political prisoners who were sentenced by Castro-controlled courts. This is the content of a resolution just adopted by the Board of Governors of the American Bar Association. (ABA News, Vol. 8, No. 11, November 15, 1963.)

While of vital interest to lawyers, the foregoing are examples of issues which are basically political. They are like a multitude of other political questions which are matters "of more than average public concern." While they are of significance to lawyers, they nevertheless remain primarily political subjects. They are matters on which lawyers and voluntary bar associations should express themselves, but on which a compulsory or integrated bar by its very nature must scrupulously desist from choosing up sides.

I doubt that I can state my viewpoint with any more clarity than has been expressed by the incumbent president of the Integrated Bar. The able president of the State Bar Association, Francis J. Wilcox, writing in the column, "The President's Page," in a recent issue of the 36 Wisconsin Bar Bulletin (August, 1963), p. 5, stated the following:

"Recent events have focused once again the attention of the membership on the responsibilities of the State Bar as a spokesman for the profession. The three constitutional amendments now pending before the legislature are of great importance to the citizens of the state and it is the duty of the individual lawyers to speak out as to their convictions with respect to these amendments and to give to the public the leadership they have a right to expect from the lawyers. However, an integrated State Bar cannot be the conscience of the individual lawyer nor can it discharge his responsibility of leadership in his community on legislative matters. At best, it can merely inform the lawyers and alert them and

they, in turn, must discharge their traditional function. Elsewhere in this bulletin we have caused to be published a scholarly analysis of the impact of these amendments and we urge you to acquaint yourself with them and, having formed an opinion on a sound basis, to speak out either singly or in voluntary groups having a common view of the matter."

I fully agree with Mr. Wilcox's statement and am unable to reconcile it with either the association's action or the majority opinion.

The highly restricted nature of the activities of an integrated bar were recognized by this court in the *Lathrop Case,* at page 240, where this court said:

"The plaintiff contends that the State Bar's legislative activities are the same as those of such voluntary bar associations as the former Wisconsin Bar Association and the American Bar Association. Such argument ignores the obvious and very material distinction that exists between the legislative activities of the State Bar and those of a voluntary association. A voluntary association is free to take a stand on any proposed legislation in any field it deems desirable."

It is my belief that the decision of the majority heralds the ultimate demise of the Integrated Bar if, under the aegis of this *per curiam* decision, the State Bar is encouraged to lend its prestige and facilities in connection with political controversies.

I am authorized to state that Mr. Justice DIETERICH joins in this dissent.