FRANKLYN M. GIMBEL, President State Bar of Wisconsin
Your predecessor requested my opinion regarding possible liability of the State Bar (Bar) or individual committee members because of the "activities" of the State Bar Unauthorized Practice of Law Committee and the State Bar Ethics Committee especially as it relates to antitrust law and denial of due process. He also sought my opinion regarding the "activities" of the Lawyer Referral and Information Service, more popularly known as the "Lawyer Hotline," where volunteer lawyers talk by telephone to members of the public and give legal advice on simple legal questions. Since the "activities" are not fully described in the opinion request in terms of a factual setting, this opinion is limited to activities authorized by the supreme court.
I.
Our discussion appropriately begins with an examination of the nature of the Bar. The Bar is an integrated bar, that is, it was created "as a state agency to serve a public purpose" by constitutional authority of the supreme court. Lathrop v.Donahue, 10 Wis.2d 230, 243, 102 N.W.2d 404 (1960), aff'd,367 U.S. 820 (1961). The court has the exclusive authority to determine the functions of the Bar and has the exclusive authority to determine its existence or demise. Its supervisory function over the Bar was explained by the court in Lathrop,10 Wis.2d at 240:
 However, as we pointed out in our opinion in the 1958 In re Integration of Bar Case, this court will exercise its inherent *Page 154 
power to take remedial action should the State Bar engage in an activity not authorized by the rules and bylaws and not in keeping with the stated objectives for which it was created.
The Bar's status as a state agency was explained in Lathrop,10 Wis.2d at 243:
 The State Bar is a public agency the same as the judicial council. One has been created by the court and the other by the legislature but each was created by state action as a state agency to serve a public purpose.
It appears clear, therefore, that the Bar is a state agency as created by the constitutional judicial power of the supreme court. However, the supreme court expects "the bar to act freely and independently on all matters which promote the purposes for which the bar was integrated" provided such acts are "within the framework of its rules and by-laws," Axel v. State Bar,21 Wis.2d 661, 124 N.W.2d 671 (1963).
It is thus instructive to examine the functions of the Bar as authorized by rules and bylaws in the fields of unauthorized practice, ethics and the "Hotline," and then determine whether those functions are "in keeping with the stated objectives for which it [the Bar] was created." Lathrop, 10 Wis.2d at 240. The Unauthorized Practice Committee derives its authority under Article IV, Section 10 of the bylaws which were originally approved by the supreme court in connection with the official integration of the Bar. Section 10 reads as follows:
 Section 10. Committee on Unauthorized Practice of Law. This committee shall keep the membership informed with respect to the illegal practice of law by unlicensed laymen, and shall endeavor to eliminate the exposure of the public to the hazards of unskilled and unauthorized practice of law by those who have not met the education and moral standards and who are not subject to the ethical standards or disciplinary regulation required for those licensed to practice the profession of law.
In Lathrop, 10 Wis.2d at 248, the court explained the duties of the Committee on Unauthorized Practice:
Discouraging Unauthorized Practice of the Law.
 One of the standing committees of the State Bar is that of unauthorized practice of law. The primary purpose of such committee *Page 155 
is to protect the public from incompetent laymen attempting to offer or perform legal services which they are not competent to render. This is a constant program since numerous trades and occupations keep expanding their services and frequently start offering services which constitute the practice of the law. As a result of integration the income from dues has enabled the State Bar to employ an additional lawyer on its staff whose major assignment is to investigate complaints made with respect to instances of unauthorized practice of the law, and to cause any unauthorized practices so discovered to be discontinued through persuasion or legal action.
Briefly stated, the committee, with the help of the staff attorney, reviews complaints received from the public, government agencies, judges and attorneys concerning unauthorized law practice. If the committee, after investigation, concludes that the complained of activities are the practice of law and unauthorized, efforts are made to secure voluntary compliance, usually by letter. If those efforts are successful the matter is closed.
In those cases where compliance is not forthcoming by "persuasion," the matter is referred to the Board of Governors with a recommendation for "legal action." Lathrop,10 Wis.2d at 248. If the board agrees, a request is sent to this office for appropriate legal action. If we agree that legal action is justified, we determine whether to bring a civil action or criminal action and, if the latter, we usually refer the matter to the district attorney of the county involved.
Since integration, the Bar has been involved as a complainant or party in several cases involving the unauthorized practice of law. State ex rel. State Bar v. Keller, 16 Wis, 2d 377,114 N.W.2d 796, 116 N.W.2d 141 (1962), vacated, 374 U.S. 102 (1963);State ex rel. State Bar v. Bonded Collections, 36 Wis.2d 643,154 N.W.2d 250 (1967); State ex rel. Baker v. County Court,29 Wis.2d 1, 138 N.W.2d 162 (1965); and State ex rel. Reynolds v.Dinger, 14 Wis.2d 193, 109 N.W.2d 685 (1961). The supreme court has recognized in those cases that the Bar has been acting within the delegated authority specified in Lathrop.
The second function to be discussed is the Ethics Committee which is also created by the State Bar Bylaws. Article IV, Section 5 reads as follows: *Page 156 
 Section 5. Committee on Professional Ethics. This committee shall formulate and recommend standards and methods for the effective enforcement of high standards of ethics and conduct in the practice of law; shall consider the "Code of Professional Responsibility and Disciplinary Rules as adopted by the Wisconsin Supreme Court" and the observance thereof, and shall make recommendations for appropriate amendments thereto. The committee shall have authority to express opinions regarding proper professional conduct, upon written request of any member or officer of the State Bar. However, the committee shall not issue opinions as to the propriety of past or present conduct of specific member attorneys unless requested to do so by a grievance committee of the State Bar or by the Board of Governors of the State Bar. In those latter instances of requests relating to a specific member, they shall be treated as confidential and shall not be open to public inspection. In such cases, the opinion of the committee shall not disclose the names of any parties, but such opinion shall be open for inspection in the same manner as other opinions of the committee.
The supreme court acquiesced in the establishment of this committee when it approved the bar's original bylaws. The purpose of the committee was the promotion of high standards of ethics and conduct in the practice of law. The committee is authorized to express opinions interpreting chapter SCR 20 known as the "Code of Professional Responsibility." The opinions which are authorized by the committee can interpret whether specific conduct meets with the provisions of chapter SCR 20. However, as is the case with the unauthorized practice of law, whether certain conduct violates specific ethical standards is, in the final analysis, the responsibility of the supreme court. An opinion of the Ethics Committee to a member or officer of the Bar serves an advisory function but is not binding on the Board of Attorney's Professional Responsibility and the supreme court. The intent is to provide guidance to the profession and, as is explained in SCR 20.002: "The code is adopted by the Wisconsin supreme court both as an inspirational guide to the members of the profession and as a basis for disciplinary action when the conduct of a lawyer falls below the required minimum standard stated in the disciplinary rules."
The Ethics Committee may not, however, issue opinions as to the propriety of past or present conduct of an attorney unless requested to do so by a grievance committee of the State Bar (now called Professional Responsibility Committee) or by the Board of *Page 157 
Governors. In those cases, the request and opinion are confidential and are not to be open to public inspection.
Finally, it should be noted that the supreme court rejected in 1983 and again in 1985 State Bar petitions seeking the supreme court's direct authorization of the Bar's ethics and unauthorized practice activities. In December of 1983, the Bar petitioned the court to set up the State Bar as an "official arm" of the court, acting in a quasi-judicial capacity. The Bar would have been "charged by the court with the duty of advising and educating State Bar members on matters pertaining to the standards of professional conduct." A reconstituted standing committee on professional ethics would have had the power and "responsibility" to issue advisory opinions. The supreme court denied the petition by order dated February 7, 1985.
The court observed that the petition[1] was "substantially the same" as petitions filed by the State Bar in April of 1982, which were denied by the court in January of 1983. The 1985 order provided in part as follows:
 In [the 1983] order, the court stated that it was of the opinion "that it is not proper for the court, as final arbiter in unauthorized practice of law and professional ethics matters, to participate in the giving of advisory opinions by State Bar committees." The court continued to be of that opinion.
 . . . [T]he State Bar is not the proper entity to render formal advisory opinions having any binding effect for the reason that it neither promulgates the rules of professional ethics or the rules prohibiting the unauthorized practice of law nor enforces them.
 . . . [T]he regulation of the practice of the law is a judicial power and is vested exclusively in the Supreme court, although we have recognized the Legislature's authority to place additional penalties upon those who engage in the authorized practice of the law . . . . Consequently, it is not proper that this court participate to any extent in the rendering of advisory opinions on either issue.
 Notwithstanding the State Bar's concern with the rules of professional ethics and the unauthorized practice of law and its desire to assist its membership in dealing with these matters, we decline to give it the authority, quasi-judicial or otherwise, to *Page 158 
issue advisory opinions that either are binding on the court and its Board of Attorneys Professional Responsibility or are subject to review by the court. (Emphasis added).[2]
The third activity on which you seek advice is the Lawyer Referral and Information Service, commonly known as the "Lawyer Hotline." You explain that the "Hotline" makes volunteer lawyers available to talk by telephone to members of the public who have simple legal questions. The service is offered totally without charge to the caller. If the person needs more assistance than can be provided during a short five minute telephone conversation, the caller is urged to consult an attorney of his or her choice. The volunteer lawyer does not give his or her name to the caller and is not available to perform services for a fee.
There is no specific bylaw or supreme court rule which directs the Bar to provide this service. It was originally conceived, I understand, by the State Bar Foundation and proved to be an extremely popular program. Eventually it became a joint function of the Foundation and the Bar and is included in the Bar budget which is submitted to the supreme court each year for approval.
Supreme Court Rule 10.02(2) is entitled "PURPOSES." The last three lines of that paragraph read as follows: "to promote the innovation, development and improvement of means to deliver legal services to the people of Wisconsin; to the end that the public responsibility of the legal profession may be more effectively discharged."
The functions of the "Hotline" seem to fall within the meaning of the above purposes of the Bar as approved by the supreme court. That the court approves of this function is fairly inferred from its knowledge that sums for this function are included in the budget and the function itself is part of an annual report and audit provided to the court.
II.
The first question posed is whether this office would provide legal counsel in case of a lawsuit against the Bar and individual lawyers performing authorized functions in connection with these three State Bar activities. Historically, this office has represented the integrated bar in connection with lawsuits brought against the Bar, members of the Board of Governors, and employes and agents of the Bar when such lawsuits arise out of the official state agency *Page 159 
functions of the Bar. We will continue to provide such representation where the law requires that we provide the representation. We have also provided legal services in the form of formal and informal opinions and consultations with members of the staff, the board and committees in regard to the Bar's state agency functions and will continue to do so where appropriate.
However, we may decline to provide representation in accordance with section 895.46(1)(a), Stats., where we conclude that the act complained of did not grow out of or was not committed in the course of an individual's state agency duties or is beyond the supreme court delegation. Also, where the Bar has an insurance policy covering liability asserted against the Bar, its officers, employes or agents, we may choose not to provide representation where the insurance company is obliged to do so and the claim is not in excess of the policy limits. Obviously, each case would be considered on its own merits. In those situations where there is a claim for declaratory and/or injunctive relief based on allegations of unconstitutionality of statutes or rules administered by the Bar, we have and will continue to provide legal representation without cost where appropriate.
This position, of course, assumes that this office does not have a more compelling duty not to provide such representation in a particular case. For instance if it was determined by this office that the Bar, its officers, employes or agents had exceeded the authority delegated by the supreme court and our advice to cease such conduct was ignored we would probably seek supervisory action against the Bar in the supreme court. Moreover, this office's duty to enforce the antitrust laws, see secs. 133.17, 165.065, Stats., might compel this office to act to remedy violations of the antitrust laws.
III.
The next question is in regard to possible antitrust actions being successfully maintained against the Bar because of the operation of the Unauthorized Practice and Ethics Committees. No specific cases are mentioned, but your predecessor indicates that "several observers have voiced concern that the activities of these two committees as presently constituted might raise antitrust law or constitutional due process of law problems." There is no further elaboration as to what the "observers" contend is the antitrust danger as the committees are presently constituted. Assuming that the contention is that the committees could potentially participate in anti-competitive activities, the question is whether the delegation from *Page 160 
the supreme court described above is adequate to provide blanket "state action" antitrust immunity within the meaning of Parker v.Brown, 317 U.S. 341 (1943).
Any analysis of the state action doctrine must revolve around the two-pronged test articulated by a unanimous court inCalifornia Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,445 U.S. 97 (1980). Midcal provided that for the immunity to apply (1) the state must have clearly articulated and affirmatively expressed a state policy compelling the displacement of competition in the area of the economy at issue, and (2) the state must actively supervise this displacement. AlthoughMidcal's teaching appears superficially straightforward, reconciling it with three other Supreme Court decisions dealing with state action immunity in the context of state bar activities is no mean feat.
For example, both prongs of the Midcal test appear to have been diluted in Hoover v. Ronwin, 104 S.Ct. 1989 (1984), and Bates v.State Bar of Arizona, 433 U.S. 350 (1977).
In neither Hoover nor in Bates did the state supreme court in question "compel" the specific conduct at issue. In Hoover, the Bar committee appointed by the supreme court was not compelled to adopt the grading system it adopted. The plaintiff's primary claim against the committee was that it had adopted a "grading scale on the February examination with reference to the number of new attorneys it thought desirable, rather than with reference to some `suitable' level of competence." 104 S.Ct. at 1994. The plaintiff claimed that the state action doctrine did not apply because the supreme court had not directed the committee "to artificially reduce the number of lawyers in Arizona." Id. at 1999. The Court rejected plaintiff's argument stating that it largely ignored the facts surrounding the delegation of authority by the Arizona Supreme Court to the committee and, most importantly, the fact that the Arizona Supreme Court retained ultimate authority to grant or deny admission to the practice of law in the state. Id. at 1999-2000.
In Bates v. State Bar Arizona, 433 U.S. 350 (1977), the Court found that the state action exemption was applicable because the Arizona Supreme Court had in effect ratified and adopted the State Bar rule limiting advertising by attorneys. The plaintiff argued that because the state bar had not been compelled to recommend the advertising rule to the Arizona Supreme Court, the Court should *Page 161 
follow Cantor v. Detroit Edison Co., 428 U.S. 579 (1976), and reject state action immunity. The Court, however, found state action immunity and distinguished Cantor on the basis that a "utility could not immunize itself from Sherman Act attack by embodying its challenged practices in a tariff approved by a state commission." Bates at 360. In addition to not being required to file the challenged practices in a tariff, the Court held that the state commission had never passed on the challenge practices, and hence, there could be no antitrust immunity. Id. In short, the court in Bates held that the advertising restriction was the action of the court and the mere fact that it was adopted without compulsion was not significant.
Similarly, it does appear to be fatal to a claim of state action immunity that the state has not clearly articulated and affirmatively expressed a state policy to replace competition with regulation as it relates to a specific action by a state agency. At one level, it is clear that the State of Wisconsin through both the Legislature and the Supreme Court has clearly articulated and affirmatively expressed a state policy to replace open competition in the market for legal services with barriers to entry in the practice of law (e.g., penalties for practicing without a license, sec. 757.30, Stats.) and ethical constraints on how those competing in the market operate their practices (e.g., authorization of Article IV, Section 5, of the State Bar Bylaws creating the Committee on Professional Ethics).
Hoover, Bates and Goldfarb v. Virginia State Bar, 421 U.S. 773
(1975), collectively suggest further that where a state bar or state bar committee acts to effect a state supreme court's policies on setting appropriate limits on competition among those seeking to provide legal services to the public, the court will find those actions which are in furtherance, to some unclear degree, of those policies to be exempt.
The issue, of course, is to what degree must the supreme court "guide" or "direct" the actions of the bar for the exemption to apply. On this point, the contrast between Hoover and Goldfarb is instructive. In Goldfarb, "state law did not refer to lawyers' fees, the Virginia Supreme Court rules did not direct the State Bar to supply fee schedules, and the Supreme Court rules did not approve the fee schedules established by the State Bar." Hoover,104 S.Ct. at 2001 n. 32. Consequently, even though the Virginia State Bar was a state agency, the Court concluded that the actions of the State Bar were not immune under the state action doctrine. Although no state law *Page 162 
or supreme court directive told the Arizona Bar committee what its grading formula ought to be, the Court in Hoover impliedly held that the grading formula adopted was "consistent enough" with the general policy of limiting admission to the market for legal services to those reaching a certain degree of competence.
In short, when one attempts to reconcile Goldfarb with Bates
and Hoover, the test that emerges is no longer one of the traditional two-prong test of "compulsion" and "clearly articulated and affirmatively expressed state policy." Rather, it seems that the exemption applies if a Bar or Bar committee acts pursuant to or consistent with the state supreme court guidelines — even if much discretion is left to the Bar committee (e.g.. Hoover), even if the Supreme Court did not initiate the action (e.g., apparently in Bates), and even if the court did not specify in detail how the Bar committee should carry out its functions (e.g., Hoover). Where the State Bar acts on its own without any guidelines from the state supreme court, state action immunity will not apply even though the actions of the State Bar are arguably consistent with the general policy of the state supreme court to temper competition among lawyers (e.g.,Goldfarb).
Ultimately, the dividing line between Goldfarb, on the one hand, and Hoover and Bates, on the other hand, seems to hinge on the specific activity of the Bar or Bar committee involved in light of the specific directions given by the state supreme court. For example, in Goldfarb, the State Bar had issued two ethical opinions indicating that the fee schedules could not be ignored. 421 U.S. at 777. Arguably, the fee schedules could be rationalized as consistent with some state supreme court policy affecting competition. Whether or not the activity of the Bar is connected enough to supreme court guidelines and directives would seem to be an issue that has to be decided on a case-by-case basis with reference to the specific setting of the Bar activity.
However, this dependency on the facts of the specific situations creates considerable confusion in dealing with the question of whether state action immunity is available for all actions of the two Bar committees at issue. Simply stating that the committees are acting "within their authority" does not resolve the question. For example, in Goldfarb the Supreme Court had delegated to the State Bar the "authority" to regulate the legal profession. But the Court determined that that was not enough direction to activate state *Page 163 
action immunity with regard to the adoption of fee schedules. If the Virginia Supreme Court had articulated a general policy that attorneys should price their services in a "reasonable manner," would that have been sufficient to give the State Bar state action immunity to adopt a specific fee schedule? What if the Bar had asked the Virginia court for more explicit authorization and had been rejected as was the case with the Wisconsin Bar? My reading of these cases suggests that the answer to these questions in the context of the state action doctrine are largely factual and ought to be dealt with on a case-by-case basis.
Hence, although I tend to believe that much of what the two State Bar committees in this case do may fall within the state action exemption, I share what I think is the Bar's concern that there may be situations where the actions of either committee may not be within the immunity. [For example, what if the Unauthorized Practice Committee decides a particular use of paralegals by an aggressive firm constitutes "unauthorized practice" in the absence of any specific supreme court policy thereby dampening the use of paralegals? Or what if the Ethics Committee rules that such use of paralegals is unethical?] My concern in this regard is not tied to any specific fact pattern, but rather relates to my conclusion that ironclad guarantees are impossible in the face of a rather unsettled situation caused by three supreme court opinions within the last ten years which are more than a little difficult to reconcile.[3] I suggest that if you have specific actions that either of the two committees intends to take that may be a cause for concern, that you frame those questions to us for an opinion on the state action doctrine at that time.
IV.
The next question relates to the likelihood of success of a claim against the Bar or individual committee members based on denial of property without due process of law. Due process is one of those terms in the law which is not easily defined except as it applies to specific situations. The constitutional provision, of course, prohibits *Page 164 
denial of life, liberty and property without due process. To find a violation of due process where it concerns property, we have to determine first that it is property within the constitutional meaning, that there was a deprivation, and that the process afforded did not meet constitutional standards. The United States Supreme Court pointed out in Board of Regents v. Roth, 408 U.S. 564
(1972), in a case arising out of the University of Wisconsin-Oshkosh, that a nontenured professor whose one-year appointment was not renewed had no property interest in reappointment. The Court pointed out that property interests do not arise under the constitution: "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board ofRegents v. Roth, 408 U.S. at 577.
Frankly, it is difficult to identify property interests that might be affected by the Unauthorized Practice Committee in the abstract. It would be difficult to show "entitlement" and, therefore, difficult to show a property interest in the unauthorized practice of law. However, if the committees acted against other professionals, e.g., public accountants or paralegals, a protectible property interest may be a present. Again, it is difficult to answer the question you pose in the abstract.
Perhaps a more useful way to approach this question is with regard to the overall process of initiating unauthorized practice investigations and the prosecution thereof, whether civil or criminal which I outlined above. The Bar committees, in carrying out its unauthorized practice functions, merely requests this office to initiate the complaint process. This office decides whether to initiate an action and the type of action.
In the case of the Ethics Committee which deals with licensed attorneys who have a property interest in the license, there appears to be no due process problem in connection with the issuance of requested opinions relating to future conduct. In the case of opinions relating to past or present conduct being investigated by a professional responsibility committee (formerly grievance committee of the State Bar) or by the Board of Governors, there would appear to be a property interest involvement which would require appropriate due process at some
stage prior to any sanctions. But if such opinion led to a hearing before a professional responsibility *Page 165 
committee, and subsequently before the Board of Attorneys Professional Responsibility in accordance with chapter SCR 22, the procedures afforded before those two bodies appear to provide adequate due process. If the Board of Governors reported directly to the Board of Attorneys Professional Responsibility concerning ethical conduct, again it appears that due process would be provided by a hearing before the Board of Attorneys Professional Responsibility and ultimately consideration by the supreme court.Disciplinary Proceedings Against Eisenberg, 117 Wis.2d 332, 336
(1984).
V.
The final question relates to whether indemnification would be available from the state if a successful claim were made against the Bar, the board, members of the committees and the volunteer lawyers operating the "Hotline," assuming that "all action was in good faith and within the parameters established by State Bar Rule and Bylaw." Your question apparently assumes that liability has been established or is conceded.
There are, of course, defenses which should be considered whenever claims for money damages are made against the state, its agencies, officers and agents. One of these defenses, the immunity afforded public officers with respect to the performance of their official functions, deserves some discussion. This common law immunity has been recognized by our supreme court as protecting individuals who perform governmental functions from substantive liability for damages. The court listed the public policy considerations for such immunity in Lister v. Board ofRegents, 72 Wis.2d 282, 299, 240 N.W.2d 610 (1976).
 These considerations have been variously identified in the cases as follows: (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public office.
This common law immunity is available only where the act complained of was within the scope of the official authority of the *Page 166 
individual and in line with official duty and involves the exercise of some discretion and judgment. The negligent performance of purely ministerial duties would not entitle the individual to common law immunity. There are various other exceptions to the rule which are determined by judicial balancing of the need of public officers to perform their functions freely against the right of an aggrieved party to seek redress.
The question of indemnification of volunteer lawyers who perform services in connection with the operation of the "Hotline" involves a determination as to whether such volunteers are agents of the state within the meaning of section 895.46 (1)(a). That statute provides in part: "Agents of any department of the state shall be covered by this section while acting within the scope of their agency."
A similar question was raised in regard to the members of the professional responsibility committees appointed by the Bar who assist the Board of Attorneys Professional Responsibility in the investigation of lawyer conduct. I concluded in an unpublished opinion, OAG 48-78, that the committee members are "public officers" within the meaning of then sections 895.45 and 895.46. At that time, the statute covered agents of any department of the state where there was a written agreement entered into prior to the occurrence of any act. Chapter 20 of the Laws of 1981 adopted the present language in regard to agents which eliminates the requirement of a written agreement. If the volunteer members of the professional responsibility committees are considered to be "public officers," one might argue that "Hotline" volunteers are "agents." If so, indemnification would be appropriate subject to the limitations set out in section 895.46 (1)(a) and subject to the limitations of section 893.82.
However, this issue may be moot given that Article VII of the bylaws of the Bar provides for indemnification of officers, employes and agents of the Bar and subsection 5 specifically authorizes the Bar to purchase and maintain insurance on behalf of any "State Bar Person" against any liability incurred in any capacity as a "State Bar Person." Article VII, section 1 defines a "State Bar Person." I understand that the Bar has errors and omissions insurance to cover the general liability of officers, committees, employes and agents of the Bar. Indemnity under section 895.46 would be available only to the extent that such liability is not covered by any *Page 167 
insurance which might be applicable, including such person's own malpractice liability insurance.
Section 893.82 contains both a notice of claim requirement and a limitation of damages provision which apply to state officers, employes or agents. Section 893.82 (3) provides that a claimant must serve the attorney general with notice of claim within 120 days of the event causing the injury. The amount recoverable by any person is limited by section 893.82(6) to $250,000 and no punitive damages may be recovered. The notice of claim and limitations on damages statutes do not apply to civil rights actions brought under 42 U.S.C. § 1983. Doe v. Ellis,103 Wis.2d 583, 309 N.W.2d 375 (Ct. APP. 1981); Thompson v. Village ofHales Corners, 115 Wis.2d 289, 340 N.W.2d 704 (1983).
BCL: KJO
[1] In the matter of the amendment of SCR Chapter 10 State BarRules (February 7, 1985).
[2] Id. at 1-2.
[3] Note that the vote in Goldfarb was 8-0, the vote in Bates
was 9-0 on the state action issue (5-4 on the first amendment issue), and in Hoover the vote was 4-3 with two abstentions and a vigorous dissent by Justice Stevens. The fact that Justice Rehnquist voted with the majority in both Bates and Goldfarb, while abstaining in Hoover, together with O'Connor's addition to the court after Bates and Goldfarb and her abstention in Hoover, makes it even more difficult to predict how the court would decide future such state action cases. *Page 168