**William J. ANGARANO, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Richard H. LONG, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Lucius Frank McKOY, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Gertrude BARNES, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Joseph RUSSELL, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 7006, 7140, 7168, 7312 and 7435.**

District of Columbia Court of Appeals.

Dec. 2, 1974.

Norman Lefstein, Robert Weinberg, and Jeffrey Freund, Washington, D. C., for appellants.

Harold H. Titus, Jr., U. S. Atty., and John A. Terry and William D. Pease, Asst. U. S. Attys., for appellee.

Austin F. Canfield, Jr., and David N. Webster, Washington, D. C., amicus curiae for The Bar Association of the District of Columbia.

Charles T. Duncan and David N. Webster, Washington, D. C., amicus curiae for Board of Governors of The District of Columbia Bar.

Before REILLY, Chief Judge, KELLY, FICKLING, KERN, GALLAGHER, NEBEKER, YEAGLEY, and HARRIS, Associate Judges, and PAIR, Associate Judge, Retired.[1]

HARRIS, Associate Judge, with whom REILLY, Chief Judge, NEBEKER and YEAGLEY, Associate Judges, and PAIR, Associate Judge, Retired, concur:

Reconsideration en banc has been sought of the decision of the division of the court

1. Judge PAIR participated in the resolution of this matter as an Associate Judge prior to April 14, 1974, on which date his status be-

came that of a retired judge pursuant to D.C. Code 1973, § 11–1502.

in these cases (which have not been consolidated but which have been considered together for the convenience of the court and the parties). Angarano v. United States, D.C.App., 312 A.2d 295 (1973). The motion is denied. In light of the dissenting views expressed by our brothers Gallagher and Kern, the position of the majority should be stated briefly with respect to three aspects of these cases.

## I. The Brief of the District of Columbia Bar

One concomitant of the extensive District of Columbia court reorganization decreed by Congress in 1970, was the creation by this court of what is generally referred to as a unified bar. Acting under the authority of D.C. Code 1973, § 11–2501, this court adopted a number of rules, one of which made membership in the District of Columbia Bar compulsory for all lawyers admitted to practice in this jurisdiction. This is in contrast to the nature of the long-established Bar Association of the District of Columbia (and a number of other bar associations in this jurisdiction), in which membership is voluntary.

The Public Defender Service (PDS) sought reconsideration en banc of the division's decision. Amicus curiae briefs were tendered on behalf of both the District of Columbia Bar and the Bar Association of the District of Columbia.[2] The govern-

ment, represented by attorneys who themselves are obliged to be members of the unified bar, vigorously opposed the filing of the brief tendered on behalf of the District of Columbia Bar, contending that the unified bar "may not, consistently with the First and Fifth Amendments, and without creating significant issues of conflict of interests, take partisan positions upon matters being litigated in the District of Columbia courts to which it is not a party."[3]

There is no doubt that the constitutional problems presented by the submission of an amicus brief purportedly expressing the position of the total membership of a compulsory bar on a question to be decided by this court are serious ones. See, e. g., Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), particularly the dissenting opinions of Mr. Justice Black and Mr. Justice Douglas at pp. 865 and 877, 81 S.Ct. 1826, 6 L.Ed.2d 1191, respectively. In considering the petition for reconsideration en banc in this case, a majority of the court concluded that it is unnecessary to resolve those problems now. Accordingly, it was decided to accept the brief as one filed on behalf of the Board of Governors of the unified bar. The constitutional issues concerning the filing of a brief supposedly representing the position of the entire bar are ancillary to the basic question now before us, and our decision to refrain from resolving them at this time was neither abstruse nor unique.[4] See, e.

---

2. The two briefs are quite similar; both are attributable principally to the same attorney. One draft apparently was ratified by the Board of Directors of the Bar Association; a slightly different draft apparently was ratified by the Board of Governors of the unified bar.

3. No referendum of the unified bar's membership was conducted on the questions presented. There is no indication that anyone other than the members of the Board of Governors considered the brief, or that anyone other than parties to the proceedings even knew that an amicus brief had been tendered for filing.

The government took no position on the merits of the PDS motions to withdraw, which prompts comment by the minority. See Opinion of Judge Gallagher at 459, n. 3 and 464, infra. The government's silence on that question was to be expected; the identity of a defendant's counsel is of no concern to the government.

4. Indeed, after discussing at some length his belief that the Board of Governors of the unified bar properly may file an amicus brief on behalf of the entire membership, our brother Gallagher acknowledges that: "It would be imprudent to consider here the constitutional claim on the merits . . . ." Opinion of Judge Gallagher at 462, infra.

*g.,* United States v. Thirty-seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971).

## II. *The Procedural Posture of the Case*

Our dissenting colleagues express the thought that the majority has "ignored" our court's Rule 40 in denying the petition for reconsideration en banc. In fact, as would be expected, Rule 40 was considered carefully by the majority. In our view, the dissenting statements reflect a reluctance to accept a procedural concept which the majority considers to be an indispensable aspect of the proper functioning of an appellate court.

In Smith v. United States, our No. 6980, one PDS attorney filed a 30-page brief on the merits of the appeal, presenting a number of issues. None related to the possible ineffectiveness of trial counsel, who had been another member of the PDS staff. On June 1, 1973, the government filed its brief on the merits. On July 9, 1973, a third PDS attorney filed a motion for leave to withdraw. Exclusive of a few citations, the entire text of that motion was as follows: "Counsel for appellant is compelled to respectfully request leave to withdraw from and have new counsel appointed to this case due to ethical considerations."

■ Reference to the citations in that motion indicated that the new PDS appellate attorney felt that trial counsel may have been ineffective to the point of depriving the appellant of his constitutional rights (although the motion itself did not so state). The motion was considered by a division of the court consisting of Judges Fickling, Kern, and Gallagher. On July 26, 1973, Judges Kern and Gallagher voted to grant the motion. Judge Fickling dissented. Leave to withdraw was granted by means of a simple, typed order. The division's intended disposition of the motion was not circulated to the other members of the court, and no opinion was written set-

ting forth the reasoning of the two judges who voted to grant the motion. While that particular division did dispose of the narrow question before it, in no sense did its action constitute a "decision" of the court within the contemplation of either M. A.P. v. Ryan, D.C.App., 285 A.2d 310 (1971), or our Rule 40(c). More specifically, the perfunctory ruling on the motion in the *Smith* case could not and did not bind future divisions which might be asked to decide similar motions.

■ Meanwhile, the separate motions to withdraw in the five cases now before us came on for consideration before a division composed of Chief Judge Reilly and Judges Kelly and Nebeker. Concerned by the rash of PDS motions to withdraw as appellate counsel based upon apparent assertions of ineffectiveness of PDS trial counsel, the new division concluded that a decision should be promulgated. A draft opinion was written and circulated by the majority to the full court, with Judge Kelly dissenting. The opinion duly became adopted, issued, and published. Thenceforth, that decision—Angarano v. United States, *supra*—constituted a part of the body of law in this jurisdiction, absent rejection by a majority of the court en banc or reversal by the Supreme Court. *See, e. g.,* Robinson v. United States, 106 U.S.App.D.C. 325, 272 F.2d 554 (1959).

We have no doubt of the sincerity of the views expressed by PDS, the Bar Association, the Board of Governors of the District of Columbia Bar, and our dissenting colleagues. However, a majority of the court en banc considers the standard set forth in *Angarano* to be correct. With the heavy demands which are being made upon our time, it would be pointless—indeed wasteful—for the court to go en banc to achieve the same result which the majority already considers a division to have reached correctly. Hence, the prior decision of the court (as supplemented by this opinion) remains controlling as a result of the denial of the petition for reconsideration en banc.

### III. *The Merits of the Withdrawal Issue*

A few basic comments are appropriate as to what is truly at issue in these cases. It seems to us, in effect, that PDS and the two bar organizations are discussing apples, the majority is discussing oranges, and the dissenters are discussing tangerines. The positions of PDS, the majority, and the dissenters may be characterized succinctly as follows:[5] (1) PDS contends that "in the absence of evidence of bad faith," counsel should be permitted to withdraw upon the naked assertion "that he is in a conflict situation arising from a duty to pursue a nonfrivolous claim of ineffectiveness against a fellow member of his law firm or agency". (2) The division opinion in *Angarano* includes the following two statements: "The threshold is certainly higher in such cases than nonfrivolity. * * * We think the better test is the one applied [in the trial court] when determining the necessity for a hearing on a collateral attack asserting ineffective assistance of counsel. That is—does the contention, if true, entitle the pleader to relief; or, is a prima facie case of constitutional ineffectiveness apparent?" 312 A.2d at 298 (citations omitted). "Again, we state that . . . an attack upon trial counsel is not a device to be used on appeal except in the most severe cases of glaring ineptitude." 312 A.2d at 300. (3) The dissenters take a middle-ground position, rejecting the PDS position but stopping short of the majority's view: ". . . it is our view that when appellate counsel finds himself in this [ethical] predicament he need only advise the court of the nature of his close relationship with trial counsel . . . and state in general terms the issue, such as, asserted failure to

call an important defense witness without tactical justification. In other words, to make a good faith showing it is enough to identify a 'legitimate issue' giving rise to the claim, which of course automatically excludes anything frivolous or insubstantial." Opinion of Judge Gallagher at 474–475, *infra*.

■ It thus is seen that the ultimate positions of the majority and the minority are not far apart. The question is not whether PDS may be permitted to withdraw at the appellate level if a real question exists as to whether alleged ineffectiveness of a PDS trial attorney may have reached constitutional proportions. *See* Thompson v. United States, D.C.App., 307 A.2d 764, 766–767 (1973). If such a conflict of interest does exist, most assuredly leave to withdraw should and would be granted. What PDS seeks is carte blanche to withdraw from the appellate handling of any case which was tried by another of its attorneys, simply by stating that "ethical considerations" are present. That position is rejected by all members of the court. The majority goes on from there to conclude that we have an obligation to satisfy ourselves that a prima facie case of constitutional ineffectiveness exists before granting leave to withdraw.[6] *Cf.* Anders v. California, 386 U.S. 738, 744–745, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

■ Beyond question, none of the majority envisions having a PDS appellate attorney attack a PDS trial attorney through arguing constitutional ineffectiveness of counsel. In considering these problems, it must be borne in mind that few claims of ineffectiveness may be raised properly on a direct appeal from a conviction. Appellate

5. The two bar organization briefs contain recitations of various ethical concepts with which we are in full agreement, but the briefs stop somewhat short of recommending a specific standard as to the showing which should be made to warrant granting leave to withdraw. Their general tenor, however, is supportive of the position of PDS.

6. In no sense do we impute any bad faith to PDS. *See* Opinion of Judge Gallagher at 468, *infra*. Rather, our position is that "good faith" and a "prima facie showing" are, in a setting such as this, essentially identical twins.

courts are bound by the confines of the records before them, and the vast majority of ineffectiveness questions must be raised initially in the trial court through a collateral attack advanced pursuant to D.C. Code 1973, § 23–110 [or, depending upon the circumstances, under Superior Court Criminal Rules 32(e) or 33].[7]  *See* United States v. Mandello, 426 F.2d 1021, 1022–1023 (4th Cir. 1970) ; *cf.* Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787, cert. denied, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).[8]  The correctness of proceeding in such a fashion readily is acknowledged by the minority.  *See* Opinion of Judge Gallagher at 473, *infra*.

■ To be sure, in any collateral attack advanced in the trial court under § 23–110 which is based upon allegations of ineffectiveness, if the trial court concludes that a hearing should be held, a non-PDS attorney should be appointed if the original trial counsel was with that agency.  *See, e. g.,* People v. Smith, 37 Ill.2d 622, 230 N.E. 2d 169 (1967).  Yet that proposition, obvious as it is, is not what the court has dealt with in these cases.  In the decision which we now decline to reconsider en banc, the court did not deal directly with the type of showing which should be made by PDS in the trial court to seek to have new counsel appointed to raise an ineffectiveness issue at that level.  What the court did say is that we feel obliged to receive an adequate specific showing that a

prima facie ineffectiveness issue exists before we (1) will grant leave to withdraw, and (2) will appoint new counsel (who then would decide whether to assert such an issue in this court or to seek collateral relief in the trial court).[9]  Further, irrespective of this court's treatment of a particular case, there is no bar to appointed appellate counsel's going to the trial court to point out the possible need for a hearing on an ineffectiveness question.

■ In an earlier pleading herein, PDS stated that its Board of Trustees "strongly recommended that the Public Defender Service seek leave to withdraw from the specific cases, and that to avoid any prejudice to the specific clients the cases not be discussed in any detail."  The contention that the disclosure which we hold to be necessary would prejudice a client strikes us as illusory.  After all, if an ineffectiveness question ultimately is to be considered and decided by the court, a full presentation must be made by someone at some point.  We can understand the apparent desire of PDS not to be required to say anything which might suggest a particularly poor performance by any member of its able staff, but we cannot accept the argument that a limited preliminary disclosure to a motions division would prejudice an appellant's rights.

Petition for reconsideration en banc denied.

---

7. For purposes of a collateral attack on a conviction, § 23–110 of the D.C.Code is virtually indistinguishable from 28 U.S.C. § 2255 (1970).

8. *See also* Bruce v. United States, 126 U.S. App.D.C. 336, 379 F.2d 113 (1967) ; United States v. Fisher, 477 F.2d 300 (4th Cir. 1973) ; United States v. Davis, 436 F.2d 679 (10th Cir. 1971) ; Dyer v. United States, 126 U.S.App.D.C. 312, 315, 379 F.2d 89, 92 (1967) (Bastian, J., dissenting).

9. Of interest is this court's recent opinion in Shelton v. United States, D.C.App., 323 A. 2d 717 (1974).  The division of the court

which decided it included two members of the minority in this case.  There appellate counsel in part argued his own ineffectiveness as trial counsel.  The court stated that such a "conflict should be avoided" and noted that in such a situation, counsel properly should seek leave to withdraw.  *Id.* at 718.  Nonetheless, the court did not find it necessary to appoint new counsel, and readily resolved the ineffectiveness issue on its merits.  (This reference to *Shelton* is merely factual, and is not intended in any way to encourage appointed appellate counsel to argue their own ineffectiveness at trial.)

GALLAGHER, Associate Judge, with whom Associate Judges KELLY and FICKLING join, dissenting:

The proceeding addressed by the court's orders and statement, to which this dissent is filed, has two facets:

(1) the Public Defender Service asks this court to go *en banc* pursuant to our Rule 40(c)(1) in order to resolve a conflict between decisions of two hearing divisions of this court, and also alleges that this court's decision in Angarano v. United States, D.C.App., 312 A.2d 295 (1973), adopts an analysis contrary "to the fundamental premises of the adversary system and is not in accord with existing precedent"; and

(2) the District of Columbia Bar and the Bar Association of the District of Columbia [hereinafter D.C. Bar Association] both believe the issues raised to be of sufficient importance to ask leave of this court to file the rather extensive *amicus curiae* briefs which they proffered.[1]

The court has denied the D.C. Bar's motion for leave to file its brief as *amicus curiae* but granted the D.C. Bar Association's request to do so. We disagree and will relate our views on the net effect of this ruling, viewed realistically.

At the root of it all, the Public Defender Service raises a question under the Code of Professional Responsibility—an ethical question relating to the practice of law in this jurisdiction—and it is this problem which is discussed in the briefs of the D.C. Bar and the D.C. Bar Association.[2] Since the court has accepted for filing the brief of the D.C. Bar Association we need refer to it no further in our discussion of the *amicus* issue. We confine the discussion to (1) the failure of the court to accept the brief *amicus curiae* on behalf of the D.C. Bar itself and (2) denial of the Public Defender Service motion for rehearing *en banc* on a prior denial of motions to withdraw from appellate representation in five separate criminal cases.

I.

The D.C. Bar moved this court, pursuant to D.C.App.R. 29, for permission to file a brief *amicus curiae* supporting requests by Public Defender Service (PDS) to withdraw on asserted ethical grounds from representation in five criminal appeals pending before this court. This motion of the D.C. Bar for leave to file as *amicus* was vigorously opposed by the government,[3] and the Bar filed a reply.[4]

This court ruled as follows on the motion of the D.C. Bar:

On consideration of the motion for leave to file brief *amicus curiae* filed by Charles Duncan, President, and David N. Webster, member, each of the District of Columbia Bar, of the pleadings in support thereof and in opposition thereto, and it appearing from the afore-

---

1. The briefs proffered by the Bar and the Bar Association are very much the same as their positions are the same.

2. The D.C. Bar is what is known as a unified bar, sometimes called an integrated bar. It is a compulsory membership bar and came into existence by rule of this court after a referendum of members of the D.C. Bar Association favoring a unified bar in this jurisdiction. The D.C. Bar Association, on the other hand, is a voluntary association of lawyers in this jurisdiction.

3. One might have thought that if there were to be opposition it would have come from among the membership of the D.C. Bar but this did not occur. Instead, opposition came from the government, which as a party to a criminal case normally has a right to object, but it is without standing in this particular case to raise the constitutional question. The government had filed no opposition to the motions by the Public Defender Service to withdraw as counsel.

4. An Assistant United States Attorney also filed an affidavit relating to the activities of a D.C. Bar Committee appointed to study related activities of other unified bars, of which committee the Assistant United States Attorney is a member.

said motion that "The Board of Governors believes that this brief should . . . be filed . . .", it is

ORDERED that the Clerk is directed to file the aforesaid brief *as a brief filed on behalf of the Board of Governors* of the District of Columbia Bar. [Emphasis added.]

The order is obscure because actually what was involved was a motion for leave to file by the D.C. Bar, not someone "on behalf of the Board of Governors." Yet the court in its preamble to the order extracted out of context from a purely collateral footnote in the D.C. Bar's memorandum in support of the motion the statement that "[t]he Board of Governors believes that this brief should . . . be filed . . ." and, with this as the only support, this court directs the Clerk to file the brief "on behalf of the Board of Governors."[5] We have further difficulty understanding the order because according to the rules of this court the Board of Governors is charged with the management and direction of the affairs of the Bar (Rule IV, Section 1)[6]; and one of the purposes (affairs) of the Bar is "to safeguard the proper professional interest of the members of the Bar" (Rule I, Section 2). At a glance, it would appear rather likely to us that a question of legal ethics

for the practicing bar would come within that particular purpose.

In any event, the sense of the order and the majority's explanation of it are elusive. As we read our rules the elected Board of Governors represents the Bar[7] and, therefore, for all practical purposes in this particular case it is the Bar. No member appears here and asserts otherwise.

The concept of a unified bar is not a new one. It now exists in various forms in at least 29 states plus the District of Columbia and Puerto Rico. Among the earliest states to adopt some form of a unified bar are:

| | | |
|---|---|---|
| North Dakota | — | 1921 |
| Alabama | — | 1923 |
| Idaho | — | 1923 |
| New Mexico | — | 1925 |
| California | — | 1927 |
| South Dakota | — | 1931 |
| Utah | — | 1931 |
| Arizona | — | 1933 |
| Washington | — | 1933 |
| Kentucky | — | 1934 |
| Texas | — | 1939 |
| Oklahoma | — | 1939 [8] |

It is not unusual in a newly formed unified bar that there be a certain amount of difference of opinion as to its proper role

---

5. The footnote in the Bar's motion states:
In United States v. Cummings et al., 301 A.2d 229 (1973) the question was raised whether it is appropriate for The District of Columbia Bar to file briefs as *amicus curiae.* At that time the Board of Governors convened a committee to study and report on this question. The committee has not yet reported, but *the Board of Governors believes that this brief should* nevertheless *be filed* because of the importance of the question to the Bar. [Emphasis added.]

6. D.C.App.R. IV, § 1 reads:
The affairs of the Bar shall be managed and directed by a Board of Governors consisting of the officers of the Bar and the immediate past-president of the Bar, who shall be *ex officio* members of the Board, and fifteen members elected by the members of the Bar in the manner prescribed by the By-laws.

Furthermore, D.C.App.R. V, § 4 entitled PUBLIC EXPRESSIONS states:
No opinion of the Bar on any matter involving legislation of major public interest or concern or of major importance to the members of the Bar shall be publicly expressed unless authorized by the Board of Governors.

7. At no time does the government address itself to this court's rules relating to the management and operation of the Bar. Plainly, these rules would have to be dealt with in any serious discussion of the proper role and functioning of the Bar.

8. Lathrop v. Donohue, 10 Wis.2d 230, 102 N.W.2d 404 (1960), aff'd, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); Application of Montana Bar Ass'n, 10 Mont. 101, 368 P.2d 158 (1962).

and function. Apparently that is what concerns the majority here. This question appears at times to arise in the context of fundamental opposition to the entire concept of a unified bar. *See e. g.,* In re Unified New Hampshire Bar, 291 A.2d 600 (N.H.1972);[9] Lathrop v. Donohue, 10 Wis.2d 230, 102 N.W.2d 404 (1960), aff'd, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961); Petition of Florida State Bar Association, 40 So.2d 902 (Fla.1949). Consequently, a discussion of the constitutionality of specific Bar·activities is found in cases where there is a challenge to the constitutionality of a unified bar itself. *See, e. g.,* Lathrop v. Donohue, *supra*; Sams v. Olah, 225 Ga. 497, 169 S.E.2d 790 (1969), cert. denied, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970); In re Gibson, 35 N.M. 550, 4 P.2d 643 (1931).

But what is extraordinary about this case is that the court has obfuscated the Bar's motion because of "constitutional problems" when in fact no member of the D.C. Bar is opposing the Bar's motion for leave to file and no member is asserting a denial of his or her constitutional rights. Instead, the government, which of course is not a member, is asserting, presumably on behalf of some unknown and unnamed member, that the Bar's motion should be denied on the ground that an appearance as *amicus* on the issue here involved would inevitably be an infringement upon the First and Fifth Amendment rights of some unidentified members of the D.C. Bar.[10]

It will be recalled that this issue is being raised in the context of a criminal appeal where no individual defendant is claiming that his constitutional rights are being violated by the D.C. Bar. While it may be, as we said earlier, that the government has the normally accorded procedural right of a litigating party to be heard on whether an *amicus* brief should be received for filing, the fact remains that here the government is raising a constitutional question on behalf of unnamed and uncomplaining members whose constitutional rights, it says, would be violated. The government says the Bar's "intrusion" is in "direct conflict with the *stated interests* of certain of its own members." [Emphasis added.] We are not aware of any record support for this assertion. No individual D.C. Bar member has asked this court for the opportunity to state opposition to the Bar's motion.

There is a body of law in the state courts bearing upon the nature and activities of a unified bar, *e. g.,* In re Unified New Hampshire Bar, *supra* (Should the bar be integrated); Florida Bar Bd. of Gov. Action, 217 So.2d 323 (Fla.1969) (Should the Board of Governors on behalf of the Bar advocate electoral support for revised Constitution); Sams v. Olah, *supra* (Whether the State Bar Act was constitutional); Button v. Day, 204 Va. 547, 132 S.E.2d 292 (1963) (Should the Bar publish a newsletter); Axel v. State Bar of Wisconsin, 21 Wis.2d 661, 124 N.W.2d 671 (1963) (Should the Bar have a referendum on whether to endorse nominations to the federal bench); Lathrop v. Donohue, *supra* (Whether an integrated bar is constitutional); Petition of Florida State Bar Association, *supra* (Whether the Bar should be integrated); In re Gibson, *supra* (Whether an integrated bar is constitutional; State Bar v. Superior Court, 207 Cal. 323, 278 P. 432 (1929) (May the Bar seek to disbar a sitting judge for practicing law while on the bench)? But because of the

9. This recent decision has an interesting discussion on the scope of unified bar activities.

10. The government contends that the "First Amendment does not permit compelling individual attorneys to belong to and financially support an organization which takes partisan positions on matters being litigated in the courts."

In the context of the Fifth Amendment (due process) the government asserted that "there is no indication that the membership as a whole, or any significant portion thereof, has been fully apprised that such a brief has been submitted for filing or that it has been informed of the specific points argued in the brief."

non-justiciable posture of the issue in this case we feel it would be unwise to discuss these decisions in order to decide the issue presented by the government. We will leave this to another day or, rather, until such time as we may have before us a party qualified to raise the issue on a factual record. It would be imprudent to consider here the constitutional claim on the merits since all we have is theorizing that some-

one, somewhere in the Bar must have disagreed with the Bar position.[11] We will not take that lure.[12]

What it comes to, then, is that since there was no judicially cognizable opposition to the Bar's motion for leave to file as *amicus,* this court had no reasonable alternative but to routinely grant it, having here no interest to protect, except perhaps the judicial interest. So we dissent.

11. The majority seems to state that the government has standing to raise the First Amendment issue in this case even though no member of the Bar has complained about nor protested, nor sought leave to be heard on, the Bar action here involved. In support of this statement on standing to raise a constitutional question the majority relates only that "[t]he government, *represented by attorneys who themselves are obliged to be members of the unified bar,* vigorously opposed the filing of the brief tendered on behalf of the District of Columbia Bar . . . ." (Emphasis added.) We would find it startling that government attorneys, while representing the government, may concurrently assert their private interests, and would have standing to do so by somehow clothing the government with their private interests (undeclared) as members of the Bar.

12. While we do not reach the issue because we have no one before us qualified to raise the constitutional question, the Supreme Court's decision in Lathrop v. Donohue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) is illuminating. That case involved membership in, and activities by, the Integrated Bar of Wisconsin. It presented constitutional questions of (a) rights of association and (b) free speech. A plurality of Justices had no problem with rights of association but concluded the record did not afford a sound basis for deciding the free speech question on whether a member may constitutionally be "compelled to contribute his financial support to *political activities* which he opposes." [*Id.* at 845–848, 81 S.Ct. at 1840]. [Emphasis added.] The plurality of the Court was there referring to legislative political activities.

The interesting thing is the plurality nevertheless had no hesitancy in saying that:

[b]oth in purport and in practice the bulk of State Bar activities serve the function, or at least so Wisconsin might reasonably believe, *of elevating the* educational and *ethical standards* of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process. *It cannot be denied that this is a legitimate end of state policy.* We think that the Su-

preme Court of Wisconsin, in order to further the State's legitimate interests in *raising the quality of professional services, may constitutionally require that the costs of improving the profession* in this fashion *should be shared by* the subjects and beneficiaries of the regulatory program, *the lawyers,* even though the organization created to attain the objective also engages in some legislative activity. [*Id.* at 843, 81 S.Ct. at 1838.] [Footnote omitted; emphasis added.]

It may be noted, parenthetically, that in *Lathrop* legislative activity by the Bar was in question; here it is not.

In concurring in the judgment, Justice Harlan, joined by Justice Frankfurter, felt the constitutional issues should all have been reached and decided on the side of the Bar, thus agreeing with the Supreme Court of Wisconsin. Justice Harlan stated " . . . I do not understand why it should become unconstitutional for the State Bar to use appellant's dues to fulfill some of the very purposes for which it was established." . . . [*Id.* at 850, 81 S.Ct. at 1841.]

It seems to me evident that the actual core of appellant's complaint as to "compelled affirmation" is not the identification with causes to which he objects that might arise from some conceivable tracing of the use of his dues in their support, but is his forced association with the Integrated Bar. [*Id.* at 860–861, 81 S.Ct. at 1847.]

In dissenting, Justices Black and Douglas would have reached both constitutional questions and reversed the state court. In so viewing the case, Justice Black, as he usually did, rejected the "balancing approach" on the First Amendment utilized by Justice Harlan, stating:

The "balancing" argument here is identical to that which has recently produced a long line of liberty-stifling decisions in the name of "self-preservation." . . . [*Id.* at 872, 81 S.Ct. at 1853.]

Justice Douglas observed that unified bars would put "professional people into goose-stepping brigades" and "[t]hose brigades are not compatible with the First Amendment." [*Id.* at 884–885, 81 S.Ct. at 1859.]

## II

We turn now to the Public Defender Service (PDS) petition for rehearing *en banc* on the grounds that (1) this court's decision in Angarano v. United States, *supra,* is in direct conflict with a prior decision of this court in Smith v. United States, D.C.C.A. No. 6980, Order dated July 26, 1973, and (2) "the analysis adopted by [the court] runs counter to the fundamental premises of the adversary system and is not in accord with existing precedent."

While, unlike *Angarano, supra,* the decision by the merits division (Judge Fickling, dissenting) in *Smith, supra,* was an unreported order, as is the custom in ruling upon most motions, the fact remains *Smith* was nonetheless a decision of this court, and was rendered after a full-blown oral argument.[13]

It seems undeniable that *Angarano* and *Smith* are in conflict. As a matter of fact, this court recognized this was so and stated so specifically in *Angarano, supra,* 312 A.2d at 296 n. 1. Beyond that, the court *knows* there is a conflict on the issue between the two hearing divisions; and the Public Defender Service, which was the only moving party in these cases, also believes and states there is this conflict. There is the additional factor that the issue is one of importance to the practice of law in this jurisdiction and the party raising the issue, the Public Defender Service, represents a high volume of criminal defendants in this court system. There is the further consideration, which we do not take lightly, that the ethical position adopted before this court by the Public Defender Service, which we will discuss more fully, was taken at the instance of their Board of Trustees whose members, incidentally, are appointed by the Chief Judges of the United States Court of Appeals for this circuit, this court, the United States District Court, the Superior Court and the Commissioner of the District of Columbia.[14] In so doing, says PDS, the Board of Trustees "strongly recommended that the Public Defender Service seek leave to withdraw from the specific cases, and that to avoid any prejudice to the specific clients the cases not be discussed in any detail." And, finally, both the D.C. Bar and the D.C. Bar Association urge that withdrawal be allowed upon ethical grounds, a factor we should seriously consider.

Turning first to the matter of decisional conflict between the hearing divisions of this court, it is traditional in appellate court policy, for obvious reasons, to avoid direct decisional conflict between hearing divisions of the court, especially on issues of importance to the public and the Bar.

We stated in M. A. P. v. Ryan, D.C. App., 285 A.2d 310, 312 (1971) that:

> As a matter of internal policy, we have adopted the rule that no division of this court will overrule a prior decision of this court . . . and . . . such a result can only be accomplished by this court *en banc*. [Footnote omitted.]

In our Rule 40(c) it is provided in part that "a hearing or rehearing [*en banc*] is not favored and ordinarily will not be ordered except (1) when consideration by the full court *is necessary to secure or maintain uniformity of its decisions . . . .*" [Emphasis added.] The reason for this practice in appellate courts is so elementary that extended discussion is unnecessary.[15]

---

13. The hearing and disposition of the motion were heard before the panel assigned to the case on the merits because the motion was filed after the case was briefed and calendared for argument.

14. D.C.Code 1973, § 2–2223.

15. *En banc* courts are the exception, not the rule. They are convened only when extraordinary circumstances exist that call for authoritative consideration and decision by those charged with the administration and development of the law of the circuit.

When such circumstances appear, *en banc* determinations make "for more effective

Moving to what the decisional conflict is actually about, in *Smith* the Public Defender Service filed this motion:

> Counsel for appellant is compelled to respectfully request leave to withdraw from and have new counsel appointed to this case due to ethical considerations. See District of Columbia Court of Appeals Rules, Rule X; Code of Professional Responsibility, Disciplinary Rule 2–110(c)(2), Ethical Consideration 5–21, Disciplinary Rule 5–101, Disciplinary Rule 5–105(A), Ethical Consideration 9–2; Borden v. Borden, 277 A.2d 89 (D.C.C.A.1971); NLSP v. Ryan, 276 A.2d 728 (D.C.C.A.1971); People v. Smith, 37 Ill.2d 622, 230 N.E.2d 169 (1967).

It was represented, as we said, that this position was taken at the recommendation of its Board of Trustees. No opposition to the motion was filed by the government.

At oral argument on the motion, it developed that the only real issue was whether the Public Defender Service was required to develop to the court's satisfaction a factual basis for the asserted "nonfrivolous" question of constitutional ineffective assistance of counsel at the trial on the part of a Public Defender Service attorney. A majority of the hearing division thought the PDS motion was sufficient without an elaboration on its potential merit and granted the motion for withdrawal.[16]

Earlier PDS had filed two similar motions for leave to withdraw. One was filed the same date as that in *Smith* and two were filed subsequent to the decision in *Smith*. All of these were assigned to one motions division of the court.[17] No oral argument was held, and the majority of this panel (Judge Kelly, dissenting), in denying the motions, held that in order to prevail PDS was required first to establish a prima facie case of constitutional ineffective assistance of the PDS counsel at the trial. Angarano v. United States, *supra*, 312 A.2d at 298. This set the stage for this petition by PDS for a rehearing *en banc*.

By voting against a rehearing *en banc* where there is a direct conflict in this court on two decisions of obvious importance, the court not only now ignores its own controlling decision in M. A. P. v. Ryan, *supra*, as well as its own Rule 40(c), but it leaves in confusion on the issue the Public Defender Service, which represents a substantial percentage of defendants in our court system. If, as we said in M. A. P. v. Ryan, *supra*, "no division of this court will overrule a prior decision of this court" where does the court's action now leave us? While one might assert that, in ruling on the motions, *Angarano* was published and the earlier ruling on the *Smith* motion was not—that certainly should not be controlling where there is an avowed, recognized and unmistakable decisional conflict between divisions of the court.

judicial administration. Conflicts within a circuit will be avoided. Finality of decision in the circuit courts of appeal will be promoted. Those considerations are especially important in view of the fact that in our federal judicial system these courts are the courts of last resort in the run of ordinary cases." Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326 at pages 334–335, 62 S.Ct. 272, at page 278, 86 L.Ed. 249. "The principal utility of determinations by the court in banc is to enable the court to maintain its integrity as an institution by making it possible for a majority of its judges always to control and thereby to secure uniformity and continuity in its decisions, while enabling the court at the same time to follow the efficient

and time-saving procedure of having panels of three judges hear and decide the vast majority of cases as to which no division exists within the court." Maris, Hearing and Rehearing Cases in Banc, 1954, 14 F.R.D. 91, at page 96. [United States v. American-Foreign S.S. Corp., 363 U.S. 685, 689–690, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960).]

16. The briefs in *Smith* had already been filed and a cursory reading of the uncontroverted facts revealed that a substantial constitutional issue had not been litigated by the trial attorney.

17. Unlike *Smith*, briefs had not yet been filed in these five cases.

Otherwise, the last opinion published by a division of the court would be the law—until the next one.

The *Angarano* decision was a departure from a prior decision of this court for three principal reasons: (a) the motions in *Smith* and *Angarano* were, for all intents and purposes, identical but the rulings were completely different, (b) as previously stated, the opinion in *Angarano* acknowledges this, and (c) the full court and the parties well know there is a conflict between the two hearing divisions.

Actually, unless a division of the court feels the matter of *en banc* should be considered by the full court, and unless a prior decision is distinguishable, it is the duty of a *division* to avoid departing from a prior decision of the court. Harris v. United States, D.C.App., 315 A.2d 569, 575–576 (1974) (separate statement by Judge Nebeker).

All in all, we think that, in view of the decisional conflict between the court's divisions and the importance of the issue on the practice of law in this jurisdiction, as evidenced by the importuning of the D. C. Bar and D. C. Bar Association, the court was seriously mistaken in denying rehearing *en banc* in this case and issuing instead an opinion with no precedential effect, and we hope it will not be viewed as a procedural precedent.

A. The final point for discussion is the contention of petitioners, the D. C. Bar and D. C. Bar Association that the *Angarano* analysis is contrary to the fundamental premises of the adversary system and contrary to precedent. It is important to be aware that the majority expressly leaves *Angarano* standing, including its sua sponte review of the record, as the authoritative decision in this jurisdiction on the issue here presented. The heart of *Angarano* is the sua sponte review of the record by this court in order to decide on the merits whether the asserted lack by trial counsel deprived the defendant of his Sixth Amendment rights (*see, e. g., Angarano,* 312 A.2d at 298).

We consider that the basic issue is fairly stated by the Bar as being:

> Whether an attorney for the Public Defender Service may with propriety accept appointment to represent an indigent convict on appeal in a case where the convict was represented at trial by another Public Defender Service lawyer and where in the good faith judgment of appellate counsel a legitimate issue exists as to the constitutional adequacy of the representation provided by the Public Defender Service trial counsel.[18]

Before discussing this issue, it might be well to point out preliminarily that the Public Defender Service recognizes that, in fairness, it should receive a substitute appellate appointment where one of its counsel is allowed to withdraw on the stated ground.

As we understand it, there is agreement all around that the Public Defender Service correctly analogizes itself to a law firm for present purposes. In Borden v. Borden, D.C.App., 277 A.2d 89, 92–93 (1971), we stated that:

> [W]e are reluctant ever to make an exception from the professional norm for attorneys employed by the government or others who provide legal representation without compensation from the client because then we might encourage a misapprehension that the special nature of such representation justifies departure from the profession's standards. We should avoid always any action that would give the appearance that government attorneys are "legal Hessians" hired "to do a job" rather than attorneys at law. . . . [Footnote omitted.]

That case involved the Neighborhood Legal Services Program (NLSP). We said, further, that we specifically included

---

18. Amicus brief of the D. C. Bar Association at (i) and brief of the D. C. Bar at (i).

not only the NLSP but also *"the Public Defender,* the Corporation Counsel, and the United States Attorney, as well as members of the bar who are 'house counsel' for corporations engaged in the practice of 'public interest' law." *Id.* at 93 n. 10 (emphasis added). So there is no necessity to belabor what is already established, namely, that the Public Defender Service, insofar as the Code of Professional Responsibility is concerned, is on the same footing here as a law firm or an individual practitioner. This being so, *Angarano, supra,* and the full court's action on the petition for rehearing *en banc,* has a long reach into the practice of law in this jurisdiction. By this we mean this decision reaches deeply into a serious ethical question relating to the practice of law by all local lawyers. It is not restricted to the Public Defender Service. This may be why the D. C. Bar and the D. C. Bar Association sought to be heard in this case.

To simplify matters, we initially approach the issue from the standpoint of the individual practitioner. Suppose this practitioner represented a convicted defendant at trial and also on appeal, and concludes in good faith that a legitimate issue exists as to whether he afforded the defendant effective assistance at the trial—what is the duty of counsel? As an ethical matter, should he simply continue his representation and argue his lack of trial effectiveness on appeal; or seek leave to move for a new trial in the trial court on the ground of his ineffectiveness; or should he make known the issue to his client and recommend he remain in the case and argue his ineffectiveness at trial; or should he explain the issue to the client and recommend a motion to withdraw as counsel due to the presence, in his opinion, of the question whether he provided ineffective assistance at the trial. And if the attorney takes the latter course, should the appellate court require him to spell out in more than general terms wherein his incapability manifested itself? Or would that be unwise because, if it were the law, it might chill at the outset the desire of the attorney to perform in the highest traditions of the profession by indicating that shortcomings on his part constituted ineffective assistance of counsel at the trial?

If a law partner in a firm is appointed on appeal to represent a convicted defendant who had been represented at trial by his own law partner and, upon consideration, considers that there is a genuine issue as to whether his partner rendered ineffective assistance at the trial, what is his obligation? And if he files a motion to withdraw because of the existence of the issue, should the appellate court require him to give chapter and verse on his partner? If it were the law that this is required, would that be likely to inhibit him in the first instance from making the motion to withdraw? And, if so, is the defendant apt to get the full representation to which he is entitled?

These are some of the ethical considerations in the case now before us because, as we said, the Public Defender Service is plainly on the same footing on this question as the individual practitioner or, more pointedly, the law firm.

What this court did in *Angarano, supra,* was to require the Public Defender Service attorneys to file a particularized description "of the ineffective assistance of counsel issue." 312 A.2d at 297. In response to this, PDS stated that its Board of Trustees "strongly recommended that the Public Defender Service seek leave to withdraw from the specific cases, and that to avoid any prejudice to the respective clients the cases not be discussed in any detail." PDS stated further that it wished to reiterate its view that the Code of Professional Responsibility, and decisional law, prevented its counsel "from discussing the cases in any great detail" because "(1) the discussion of the issues in a nonadversary posture might serve to prejudice the clients; (2) to simply discuss the issue without acting as an advocate would be tantamount to acting as amicus curiae."

PDS then went on to simply state the nature of the issue involved in each case.

The *Angarano* division of this court then proceeded to review the records in the cases and to discuss each generally stated issue on the merits. The division then variously denied each motion to withdraw or denied it without prejudice. Put another way, after a discussion of each motion on the merits of the issue giving rise to an asserted nonfrivolous, or substantial, claim on the existence of counsel's ineffectiveness, the court granted no motion to withdraw.

In its petition for rehearing *en banc,* the Public Defender Service draws a disturbing picture on where this court has left it as a result of the *Angarano* decision. It does this initially by tracing the previous course of events in *Smith, supra,* following the grant of its motion to withdraw as counsel in that case. It is related that this court then appointed new counsel, who thereupon took the following steps:

> [H]e then, pursuant to established practice filed a motion for new trial with the trial court, alleging that trial counsel had rendered ineffective assistance of counsel; because the grounds for the motion lay in evidence outside the record, it was necessary to hold an evidentiary hearing, at which [new counsel] called, as his only witness, original trial counsel; he sought to demonstrate, through examination and argument, that trial counsel's actions violated Smith's constitutional right to effective assistance of counsel. [Petitioner's brief at 8; footnote omitted.]

The thought-provoking point made by the Public Defender Service here is this:

> Had the division which considered the motion to withdraw in *Smith* denied that

motion, and had PDS counsel reached the same tactical and legal conclusions as did [new counsel in *Smith*], PDS counsel would have had an unavoidable obligation to pursue the same course of action as outlined above. The result would have been, at best, a ridiculous spectacle: one PDS lawyer attempting to discredit his colleague's performance. Such an occurrence might well leave the trial judge with a suspicion of a collusive attempt to secure relief for a convicted client; *it might leave the client wondering whether, in fact, these, office colleagues were conspiring against him;* it undoubtedly would result in hostility and disharmony among the PDS staff; and *perhaps most important, the potential for hostility and disharmony might serve, subtly, to chill the raising of legitimate appellate issues on behalf of PDS clients.* [Petitioner's brief at 8–9; emphasis added.]

We think this contention has validity, and it gives us concern if only because it fairly bristles with constitutional overtones. *See, e. g.,* Glasser v. United States, 315 U. S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We might say, at the same time, that this mosaic would apply with equal force to a law firm. In other words, one need only visualize the spectacle of one law firm partner forcefully examining his partner in court in an effort to establish his lack of professional ability at trial;[19] or, worse, one should consider whether this prospect would affect his judgment on whether to raise the ineffectiveness issue at all even though, objectively, he believed it to have merit. If one considers the problem of the individual practitioner, the issue becomes magnified.[20] And it would appear that individual practitioners are in the majority of those representing criminal defendants in this jurisdiction.

---

19. It would be no less a spectacle for Public Defender Service attorneys.

20. In relating the circumstances of Shelton v. United States, D.C.App., 323 A.2d 717

(1974), the majority neglects to mention that, unlike here, there was no motion to withdraw in that case, a matter of considerable significance (majority at 458 n. 9).

We have considerable difficulty envisaging a sound basis for this court to force such an unhealthy choice on counsel seeking to withdraw on appeal. As matters stand, we perceive only one reason which might require us to deny such a motion to withdraw. That reason would be bad faith on the part of counsel asking to withdraw. The Public Defender Service asserts that bad faith would remove the props for its motion.

This court in *Angarano* did not ascribe bad faith to PDS, nor does the majority here, and we discern no basis for such a conclusion.[21] But beyond that, there is the telling consideration that any such pattern of conduct would be discouraged by the facts of life.

If a pattern were to emerge where the Public Defender Service was not infrequently filing motions to withdraw on the ground of ineffective assistance by its attorneys at trial, it would certainly require consideration whether, as a first step, its Board of Trustees should be asked to account.[22] We say this because just as neither a law firm nor an individual practitioner would long withstand public scrutiny if they often appeared in court to seek withdrawal due to their own ineffectiveness or that of their partners at trials, the Public Defender Service would and should be faced with the same reality. Additionally, we should think those in the appointed managerial positions of PDS could not reasonably expect to survive very

long any such pattern.[23] There is the added factor that the Public Defender Service, in this jurisdiction at least, is considered to be composed of well-trained specialists in the field of criminal law. Consequently, it is not normally to be expected that they will be "ineffective" at trial, in the constitutional sense. Finally each PDS attorney faces the same prospect facing all attorneys, that a recurrence of such grave mistakes would hardly enhance his career.

So, even if there were no other considerations—and we believe there obviously are—we think there is inherent protection against any such pattern of conduct. We do not mean for a moment, however, that such a motion to withdraw should be inhibited by the considerations just related if it is conscientiously believed to have sufficient merit to be warranted. Otherwise, we would in turn be discouraging effective assistance of appellate counsel. We simply outline these checks and balances to illustrate an added reason that, in our view, the court realistically need have no apprehension of a bad-faith pattern in the use of the motion. Furthermore, if there were no ineffective assistance of counsel at trial it is hardly to be expected that in the final analysis a reversal would occur. This ground for reversing a conviction is sparingly utilized by appellate courts.

The principal difficulty with the exploration made on the merits of the ineffectiveness issues in *Angarano*, which that decision requires, is that it results in no so-

---

21. PDS provided this court with a generalized description of each potential ineffective assistance of counsel issue. To illustrate, in Russell v. United States, D.C.App., 312 A.2d 295, 301 (1973), a companion case to *Angarano*, it was asserted that:
"[A]ppellate counsel learned through information outside the record that for non-tactical reasons trial counsel did not secure at trial the presence of an important witness on the issue of misidentication."
Compare United States v. Thompson, 154 U.S.App.D.C. 347, 475 F.2d 931 (1973), where the court said that while normally the decision of which witness to call was the trial counsel's:

[F]ailure to investigate or call particular witnesses surely may amount to ineffectiveness of counsel in certain circumstances.
There was nothing in the above generalized showing to indicate bad faith and the division in *Angarano* did not so conclude.

22. As we stated earlier, the members of the Board of Trustees are appointed by the various Chief Judges and the Commissioner in this jurisdiction.

23. The Director and Deputy Director of PDS serve at the pleasure of the Board of Trustees. D.C.Code 1973, § 2–2224.

lution, and was a futile exercise. And as we will show this approach by the court seems to ignore what this case is all about —the question of legal ethics.[24]

Initially, we brush aside any notion that the *Angarano* division may have made a final determination on the merits of the ineffectiveness issue described by counsel as that in itself would be a denial of effective assistance of appellate counsel. In fact, the court specifically stated in its preliminary order in *Angarano*, which, in effect, called for a more particularized description of the issue, that "[s]uch showing need not take the form of advocating ineffectiveness." *Angarano, supra,* 312 A.2d at 297. Not only that, the resultant general description given by the movants expressly did not take the form of advocacy (See 468 n. 21, *supra*). Furthermore, in four of the cases involved in *Angarano,* the ineffectiveness issue was based upon information obtained by appellate counsel outside the record which of course was not explored.[25]

Consequently, we do not seriously consider *Angarano* as being a final determination on the merits of the ineffectiveness issue because if such were the case it would have been reached while expressly depriving the defendants of advocacy on appeal, contrary to the constitutional commands of Entsminger v. Iowa, 386 U.S. 748, 87 S.Ct. 1402, 18 L.Ed.2d 501 (1967); Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and Ellis v. United States, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed. 2d 1060 (1958).

It is apparent that what *Angarano* really stands for is a holding that Public Defender Service counsel have not made a showing on the merits of the ineffectiveness issue sufficient to warrant a grant of the motions to withdraw in these cases.

The irony of it all is that it leaves counsel precisely where they were before on the ethical dilemma from which they sought to be extricated. It solves nothing. Because unless this court is going to arrogate to itself the right to dictate what issues should be, *or should not be,* raised on appeal, counsel must follow their own judgment and raise these very same issues on appeal in these cases. We say this partially because the fact is Public Defender Service represents to this court in the *en banc* petition that counsel still believe that the same claims of ineffective counsel discussed in *Angarano* should be raised on behalf of their clients in the hearings on the merits.

This being so, counsel are now left with the same ethical problem with which they began. They have a worse problem, really, and one that extends to the whole bar. This court has implicitly told them, and the bar, with no discussion of the question whatsoever, that no ethical problem exists.[26]

To illustrate, this court said in *Angarano:*

> As noted above, trial counsel has filed the motion to withdraw and thus is asserting her own ineffectiveness. Presumably it is intended that *new PDS*

---

24. We realize that in two of the five cases, *Angarano,* No. 7006, and *Barnes,* No. 7312, the court dealt "facially with the merits" of the ineffectiveness issue sketched by PDS in its second memorandum in support of withdrawal. These discussions can only be characterized as *obiter dicta* and would not, and could not, constitutionally, be considered binding when these appeals are heard before the merits division of this court, on a motion for new trial made in Superior Court, or in a collateral proceeding. Thus the "holdings" and "findings" in the *Angarano* decision, 312 A.2d at pp. 298 and 300 are of no force and effect.

25. It appears, however, that the *Angarano* division sua sponte, and without advocacy by appellant's counsel, did explore the records of the various cases in evaluating *the merits* of these issues. We can see no reason why this was done. Counsel was concerned only with his or her professional responsibility.

26. Consequently, we are unable to join in the majority's statement that "the ultimate positions of the majority and minority are not far apart." The decision by this court in *Angarano, supra,* is left standing and we have all sorts of problems with it, as this opinion reveals.

*counsel* will enter an appearance in this case. [312 A.2d at 298 n. 2; emphasis added.]

Does the court really mean that if on appeal one partner in a law firm considers there is a legitimate claim to be made that he was ineffective at trial he merely turns the case over to his partner to attack his conduct of the trial and the ethical question vanishes? Or, perish the thought, is the court declining to recognize the existence of a problem in legal ethics to begin with? Or is the court inferring that whereas a single practitioner or a law firm might have an ethical problem, this would not apply to the Public Defender Service?

We are unable to say and, frankly, we prefer not to dwell upon any of those unfortunate alternatives except to ponder, if it is the latter of those, what it would do to the administration of criminal justice in this jurisdiction. What would it tell the Public Defender Service—forget the Code of Professional Responsibility as it does not apply to you? This court would never say that.

Rule X of this court states that "[t]he American Bar Association's Code of Professional Responsibility, as amended by the court . . . shall be the standard governing the practice of law in the District of Columbia."

Disciplinary Rule 2–110(C) provides in relevant part that:

. . . a lawyer may not request permission to withdraw in matters pending before a tribunal, and may not withdraw in other matters, unless such request or such withdrawal is because:

\* \* \* \* \* \*

(2) His continued employment is likely to result in a violation of a Disciplinary Rule.

Disciplinary Rule 5–101 provides:

(A) . . . a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably *may be affected by his own* . . . *personal interests.*

(B) A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness. . . . [Exceptions to this rule omitted as not relevant.] [Emphasis added.]

These two rules, violation of which could result in disciplinary action, are controlling on the conduct of the PDS attorneys in these cases. Their personal interests are affected because pursuit of their clients' cause will bring them into direct confrontation with their colleagues and it is reasonably foreseeable that this will result in personal discord as well as general office disruption.[27] More telling, however, is the resultant situation if these attorneys follow the course taken in *Smith, supra.* They

---

**27.** *See also,* Ethical Consideration 5–21, which spells out the course PDS was required to follow in these cases and the reasons therefor. It states:

EC 5–21 *The obligation of a lawyer to exercise* professional judgment solely on behalf of his client *requires that he disregard the desires of others that might impair his free judgment. The desires of a third person will seldom adversely affect a lawyer unless that person is in a position to exert strong economic, political, or social pressures upon the lawyer.* These influences are often subtle, and a lawyer must be alert to their existence. *A lawyer subjected to outside pressures should make full disclosure of*

them to his client: and if he or his client believes that the effectiveness of this representation has been or will be impaired thereby, the lawyer should take proper steps to withdraw from representation of his client. [Footnotes omitted; emphasis added.]

In the Peamble and Preliminary Statement to the Code of Professional Responsibility it is stated:

The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations. [Footnote omitted.]

will be accepting employment knowing that "a lawyer in [their] firm ought to be called as a witness . . . ." D.C. App. R. X, DR 5–101(B). But even if the court is assuming that continued representation by PDS in these cases is ethical or less clearly, that it is not unethical, Ethical Consideration 9–2 spells out why arguably proper conduct by attorneys should be avoided if such conduct has even the appearance of impropriety.[28]

While the situation here presented may seem unusual, it is not without precedent. The question has been reached in Illinois. In People v. Smith, 37 Ill.2d 622, 230 N.E. 2d 169 (1967), the petitioner sought post-conviction relief alleging, *"inter alia,* that his counsel at trial, an assistant public defender, was incompetent for various assigned reasons." The circuit court appointed the public defender to represent the petitioner and the Supreme Court of Illinois held that he was entitled to be represented by appointed counsel other than the public defender. The court said:

> We have . . . recognized the disadvantages, both to petitioner and the public defender's office, in having a representative from that office present petitioner's cause when his petition is based in part upon charges of incompetent representation afforded him at trial by the public defender. . . . This circumstance clearly confronts the public de-

fender's office with a conflict of interest since, on one hand its natural inclination would be to protect its reputation by defending against the charges of incompetency while, on the other hand, its duty as an advocate is to aid petitioner in establishing the veracity of these charges. This conflict-of-interest situation should be avoided and the petitioner be appointed counsel other than the public defender to represent him at a new hearing on his petition. [*Id.* at 624, 230 N.E.2d at 170.]

Subsequent decisions of the Illinois courts have characterized failure to follow the rule set out above as "highly prejudicial to defendant's right to full and capable assistance of counsel" and have pointed out that "where his attorney obviously has divided loyalties the defendant is clearly deprived of this right." People v. Gray, 4 Ill. App.3d 934, 935, 282 N.E.2d 189, 190 (1972) ; *see* People v. Sigafus, 39 Ill.2d 68, 233 N.E.2d 386 (1968).[29]

The validity of the reasoning in People v. Smith, *supra,* has been borne out in a subsequent case. In People v. Brittain, 52 Ill.2d 91, 284 N.E.2d 632 (1972), the court was compelled to conclude that the public defender, counsel to a defendant at trial who subsequently asserted that this representation was ineffective, did virtually nothing [30] to represent his client's interests in the post-conviction proceeding.

---

28. EC 9–2 Public confidence in law and lawyers may be eroded by irresponsible or improper conduct of a lawyer. On occasion, ethical conduct of a lawyer may appear to laymen to be unethical. In order to avoid misunderstandings and hence to maintain confidence, a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client. While a lawyer should guard against otherwise proper conduct that has a tendency to diminish public confidence in the legal system or in the legal profession, his duty to clients or to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism. When explicit ethical guidance does not exist, a lawyer should determine his conduct by

acting in a manner that promotes public confidence in the integrity and efficiency of the legal system and the legal profession. [Footnote omitted.]

29. *See also* People v. Wallace, 14 Ill.App. 3d 18, 302 N.E.2d 140 (1973) ; People v. Terry, 46 Ill.2d 75, 262 N.E.2d 923 (1970) ; People v. Watson, 43 Ill.2d 108, 251 N.E.2d 188 (1969) ; People v. Augerbright, 43 Ill. 2d 74, 251 N.E.2d 180 (1969) ; People v. Hill, 39 Ill.2d 61, 233 N.E.2d 546 (1968) ; *cf.* People v. Williams, 252 Cal.App.2d 147, 59 Cal.Rptr. 905 (1967).

30. "Every pleading filed on petitioner's behalf was obviously prepared without assistance of counsel, and although the transcripts of the proceedings in the circuit court in each instance note the presence of assistant public

An analogous situation in this jurisdiction occurred in Campbell v. United States, 126 U.S.App.D.C. 250, 377 F.2d 135 (1966). There new counsel moved for a new trial on the ground "that certain alibi witnesses, if called, would have placed [the defendant] far from the scene of the crime at the crucial hour." In the appellate court, counsel attributed this failure to original trial counsel, who had been aware of these witnesses, but

> [a]lthough he suggested that the original trial counsel might not have had a good reason for this failure, Appellant's counsel in this court explained his own failure to call original counsel as a witness at the hearing on the motion for new trial by saying that he had not wanted to embarrass trial counsel and expose him to a suggestion of ineffective assistance. High standards of professional courtesy and etiquette between members of the bar are important elements of an efficient system of justice, *but if duty to the client and deference to a professional colleague come into conflict, plainly the latter must yield to the former.* [126 U.S.App.D.C. at 250–251, 377 F.2d at 135–136 (emphasis supplied).]

Surely if that state of affairs was sufficient to arouse the court's concern in *Campbell*[31] where no law partners were involved, the record here should be sufficient to grant the motion to withdraw.

The majority reaches the overall conclusion that if PDS were proceeding by way of collateral attack under D.C.Code 1973, § 23–110,[32] and a PDS attorney was trial counsel, a non-PDS attorney should automatically be appointed[33] if the trial court concludes a hearing should be held. In support, there is cited People v. Smith, *supra*. This conclusion, to us, is unsound. We do not understand why a defendant should have to await imprisonment (after exhaustion of his right to appeal to this court) before being able to obtain independent, uninhibited counsel to raise the issue to any court on his behalf. Furthermore, in the Illinois case cited for this proposition (People v. Smith, *supra*) it so happens that the defendant had pleaded guilty and, consequently, a post-conviction collateral proceeding was his only remedy.[34] But this is hardly to say that the decision is any support for the theory that independent new counsel would not also have been pro-

defenders, they contain not one word purportedly uttered by any of them. There is nothing to indicate that counsel, at any stage of the case in the circuit court, sought to ascertain the basis of petitioner's complaints, and the *pro se* petitions were not amended so as to state his contentions in legal form. Clearly, petitioner did not receive the effective assistance of counsel which we have held essential . . .." *Id.* 284 N.E.2d at 633.

31. This was a *per curiam* opinion entered by then Circuit Judge (now Chief Justice) Burger and Circuit Judge Wright (Judge Prettyman dissenting). Ultimately, as is most often the case, the appellant failed on the merits of the ineffective assistance of counsel claim. 126 U.S.App.D.C. at 252, 377 F.2d at 137.

32. This local statute duplicates 28 U.S.C. § 2255 (1970) which provides in part:
A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without ju-

risdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move *the court which imposed* the sentence to vacate, set aside or correct the sentence. [Emphasis supplied.]

33. "To be sure, in any collateral attack advanced under § 23–110 . . . a non-PDS attorney should be appointed if the original trial counsel was with that agency."

34. The line of Illinois cases cited by us also generally involved a collateral proceeding well after imprisonment and *after pleas of guilty*. E. g., People v. Brittain, *supra*; People v. Terry, *supra*; People v. Watson, *supra*; People v. Sigafus, *supra*; People v. Wallace, *supra*; People v. Gray, *supra*. In People v. Augerbright, *supra*, the ineffective assistance of counsel issue had not been presented to the court on the prisoner's direct appeal and it appears that this might also have been the case in People v. Hill, *supra*, although the court did not foreclose the defense of *res judicata*.

vided the defendant to prosecute a direct appeal if he had been convicted after trial.

What the majority does not explain is why there should be two different rules on withdrawal of counsel in collateral proceedings and on appeal. It seems to us that the same fundamental considerations are present. To illustrate, in the prior proceeding where a division of this court granted a similar motion to withdraw (Smith v. United States, *supra*) newly appointed counsel filed a motion for a new trial under Super.Ct.Cr.R. 33. A hearing was held, findings were made by the trial court, and the case is now pending decision in this court. Whatever the procedure might be in the Fourth Circuit, *e. g.,* United States v. Mandello, 426 F.2d 1021 (4th Cir. 1970), it is not the practice here. The well-established practice in this jurisdiction was recently articulated without dissent,[35] in United States v. DeCoster, 159 U.S. App.D.C. 326, 487 F.2d 1197, 1204–1205 (1973):

> Thus, when a claim of ineffective assistance is contemplated, it should first be presented to the district court in a motion for a new trial. In such proceeding, evidence *dehors* the record may be submitted by affidavit, and when necessary the district judge may order a hearing or otherwise allow counsel to respond. If the trial court is willing to grant the motion, [the appellate] court will remand. If the motion is denied, the appeal therefrom will be consolidated with the appeal from the conviction and sentence. The record of any hearing held on the motion and any documents submitted below, will become part of the record on appeal. [Footnotes omitted.]

*Accord,* United States v. Brown, 155 U.S. App.D.C. 177, 179, 476 F.2d 933, 935 (1973); United States v. Thompson, 154 U.S.App.D.C. 347, 348, 475 F.2d 931, 932 (1973). *See also* Marshall v. United States, 141 U.S.App.D.C. 1, 5 n. 11, 436 F.

2d 155, 159 n. 11 (1970); Campbell v. United States, *supra.* This is a preferred course because it provides a record for decision rather than allowing "an attempt to retry a criminal case in [the appellate] court on affidavits presented by appellate counsel." United States v. Thompson, *supra* at 348, 475 F.2d at 932 (Robb, J., concurring), and forcing "appellate judges [to] hypothesize a rational explanation for the apparent errors in the conduct of trial" United States v. DeCoster, *supra,* 487 F.2d, at 1204 (footnote omitted). Finally, the defendant might be in a somewhat better position to prevail if his claim is meritorious inasmuch as "a more powerful showing of inadequacy is necessary to sustain a collateral attack than to warrant an order for new trial either by the [Superior] Court or by this court on direct appeal" Bruce v. United States, 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 (1967) (dicta). This being so, we fail to comprehend why the majority would decide that new counsel should unquestionably be appointed in a collateral proceeding but not on appeal. A defendant's right to independent counsel is no less on appeal than in a trial court proceeding.

The Sixth Amendment mandates that an indigent appellant be provided counsel on appeal. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). This means advocate counsel, not one acting as *amicus curiae.* Entsminger v. Iowa, *supra;* Anders v. California, *supra;* Ellis v. United States, *supra.* It is our duty to insure that appeals are conducted "with solicitude for the essential rights of the accused," Glasser v. United States, *supra* at 71, 62 S.Ct. at 465, and that every indigent appellant is provided with constitutionally effective assistance of counsel on appeal. *See* Ellis v. United States, *supra,* 356 U.S., at 675, 78 S.Ct. 974, 2 L.Ed.2d 1060.

Of equal importance with the duty of the court to see that an [appellant] has the assistance of counsel is its duty to re-

---

35. While Judge MacKinnon dissented in part he joined the majority opinion on this procedural point. 487 F.2d at 1205.

frain from embarrassing counsel in the defense of an [appellant] by insisting or indeed, even suggesting that counsel undertake to concurrently represent interests which might diverge from those of his . . . client, when the possibility of that divergence is brought home to the court. [Glasser v. United States, *supra* at 76, 62 S.Ct. at 467.]

"Of course such things as this should never happen, and the place to stop it is the professional conscience of the advocate involved." Porter v. United States, 298 F. 2d 461, 464 (5th Cir. 1962). "[J]udges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts." McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L. Ed.2d 763 (1970).

B. The majority treats the question as simply presenting a problem on what constitutes ineffective assistance of counsel. In Angarano v. United States, *supra,* the court announces the purpose of avoiding "a state of the law wherein 'ineffective' assistance of counsel can become an effective way of obtaining a new trial." *Id.* 312 A. 2d at 300.[36]

We, on the other hand, can see no such question presented. What constitutes ineffective assistance of counsel is nowhere before us. What is before us is simply the ethical question of whether a good faith showing that a "legitimate issue" exists as to the "constitutional adequacy of the representation provided by trial counsel" [37] requires appellate counsel to seek removal from the case if his law partner was trial counsel.

Our crucial difference with the majority is that we would not require the appellate

attorney seeking to withdraw to display more than "good faith" in doing so. That is to say—unlike the majority we would not require the attorney to first establish that the "contention,[38] if true, entitle[s] the pleader to relief"; nor make the test whether "a prima facie case of constitutional ineffective assistance of counsel [is] apparent." *Angarano, supra,* 312 A.2d at 298. One need only look to *Angarano* to see where that erroneous view of the issue leads. Because immediately after stating that view, which was preceded by an inappropriate sua sponte exploration of the record, the court, not surprisingly, stated:

*We hold* that even inadvertent failure to raise this constitutional attack as to § 22–2701 does not amount to a violation of appellant's Sixth Amendment right to effective representation. [*Angarano, suprà,* 312 A.2d at 298; emphasis added.]

This demonstrates that the majority views the motion to withdraw as presenting essentially a question on the merits of the asserted ineffectiveness of the trial counsel rather than the questions of (1) whether appellate counsel may, consistent with the Code of Professional Responsibility, participate any further and (2) whether this court may properly explore the record and the merits of the claim, let alone make a "holding" on it, as was done. The striking thing is that nowhere in *Angarano, supra,* nor in the majority opinion here, is there acknowledgment that what is essentially presented is a question on legal ethics. Consequently, they do not actually deal with this issue. This is perplexing.

To refine the difference between the majority and dissent, it is our view that when appellate counsel finds himself in

---

36. Ever since the *Scottsboro* case (Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932)), however, the law has been that an individual is entitled to a new trial where assistance of counsel at his former trial was constitutionally inadequate.

37. Amicus brief of the D.C. Bar Association at (i) and brief of the D.C. Bar at (i).

38. Actually, there is no "contention" involved, as it is a request for permission to withdraw on ethical grounds, normally made before the briefs are filed.

this predicament he need only advise the court of the nature of his close relationship with trial counsel, such as exists here, and state in general terms the issue, such as, asserted failure to call an important defense witness without tactical justification. In other words, to make a good faith showing it is enough to identify a "legitimate issue" giving rise to the claim, which of course automatically excludes anything frivolous or insubstantial. It is at this point that we depart from the majority, who assert the proposition that this court must go further and not only get the factual basis of the claim, which normally involves an adversary function, but also explore the record sua sponte and, of all things, on occasion make a "holding" on the merits of the issue underlying the claim. *Angarano, supra,* 312 A.2d at 298. It is no wonder *Angarano*, and the majority here, avoids discussing the issue in the perspective of legal ethics, where it belongs. Consequently, we are unable to join with the majority in its statement that "the majority and the minority are not far apart"; not with *Angarano, supra,* now being left as controlling in this jurisdiction.

After a learned analysis of the ethical considerations involved, the D.C. Bar Association takes the position that:

> There being nothing in this case from which we can conclude that the claims here are made in bad faith, the Court should permit the withdrawal of counsel so as not to force him to continue representing a client when to do so would place him in confrontation with,. if not in violation of, the Code of Professional Responsibility.

In referring to the D.C. Bar, the Bar Association said further:

> The Organized Bar and the new Disciplinary Board are actively trying to foster a sense of ethical propriety within the profession, and this Court should do everything it can to foster that goal.

The D.C. Bar, on the other hand, after the same painstaking analysis puts it this way in taking the position the motions to withdraw should be granted:

> [T]his Court should do nothing which appears to chastise a lawyer for developing a sense of ethical propriety which this Court, the organized bar and the new Disciplinary Board are actively trying to foster.

This effort by the Bar accords with the continuing effect of Chief Justice Burger to resurrect a lively interest in the Code of Professional Responsibility. As he said not long ago:

> The basic raw material for comprehensive standards of professional conduct is now available. This Association has promulgated a general Code of Professional Responsibility together with suggested disciplinary enforcement standards, a detailed set of standards for the prosecution and defense lawyers, the standards on fair trial and free press, and the report on disciplinary enforcement. Those standards, taken together, offer the best hope for maintaining an honorable and effective Bar, and every state bar association should move now to establish means to make sure those standards are rigorously enforced. Without strict enforcement of ethical standards, the Bar will fail in its mission, and it will never have, and it will never deserve, the confidence of the public. [The State of the Federal Judiciary —1971, 57 ABA J 855, 857–58 (1971) (Footnote omitted).][39]

We believe the Board of Trustees of Public Defender Service, the D.C. Bar and the D.C. Bar Association made a sound analysis and, no indication of bad faith having been found, the court should grant

39. In this general area, *see also* Chief Justice Burger, The Special Skills of Advocacy, 42 Fordham L.Rev. 227 (1973).

the petition for reconsideration *en banc*. We respectfully dissent.

Separate Statement by KERN, Associate Judge:

I find it quite difficult to understand why the court declines to rehear *en banc* this case. Six of its nine judges have divided evenly on the issue presented here; that issue involves the professional responsibility of a group of lawyers to whom the court, Congress and the bar all look to handle a significant number of criminal appeals; and, the two largest associations of attorneys in the District of Columbia have expressed deep concern about how a Division of the court, one judge dissenting, has decided that issue.

While our ostrich-like response has spared us in this particular case from deciding, as a court, the difficult ethical question presented,[1] we have paid for this temporary respite a very stiff price, *viz.*, not abiding by the court's own Rule 40(c)(1) and leaving the members of the bar afloat in a sea of uncertainty as to what the law is and dependent upon the luck of the draw as to the panel of judges who might be sitting in a particular case when the issue arises again in the future.

1. Judge Gallagher in his statement on the vote to rehear *en banc* has described clearly and discussed comprehensively its significant and complex nature.